**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 23 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DOROTHY J. NELSON,

      Plaintiff-Appellant,

v.

No. 98-6454

HELEN McMULLEN, individually and in her
capacity as a Police Officer; PAUL RATZLAFF,
individually and in his capacity as a Police Officer,

      Defendants-Appellees.

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 98-CV-285)**

---

Brian M. Dell of Brian M. Dell, P.C., Oklahoma City, Oklahoma, for Plaintiff-
Appellant.

Margaret McMorrow-Love, Oklahoma City, Oklahoma, for Defendants-Appellees.

---

Before **BRORBY, McWILLIAMS** and **HENRY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

This case presents a bizarre and unique set of circumstances. What began as a routine traffic stop for a speeding violation ended some ten to fifteen minutes later with the female driver of the speeding vehicle proving she was not the person wanted on an outstanding felony warrant, by exposing her breasts to police officers on the shoulder of a city street in Chickasha, Oklahoma. The driver sued the police officers pursuant to 42 U.S.C. § 1983. Granting the police officers' summary judgment motion, the district court found the officers enjoyed qualified immunity from the driver's claims. While we are dumbstruck at the officers' inability to better control the events surrounding this stop in order to avoid the resultant public exposure, we exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

BACKGROUND

At approximately 2:30 p.m. on Saturday, January 3, 1998, Helen McMullen, a police officer with the Chickasha Police Department, stopped Dorothy J. Nelson for speeding.[1] Ms. Nelson's twin nine-year-old sons were passengers in her

---

[1] In her brief, Ms. Nelson states she was stopped on the pretext she was speeding. However, Ms. Nelson admitted in her deposition she was speeding, and her counsel admitted at oral argument he did not mean to infer the initial stop was in any way illegal by calling it a "pretext." Clearly this was not a pretextual stop. We will say no more on the issue other than to remind counsel of the very specific and important meaning "pretext" has in the search and seizure area, and to encourage all counsel to carefully choose their words and rhetoric before this

-2-

vehicle. Officer McMullen approached Ms. Nelson's vehicle, explained the reason for the stop, collected Ms. Nelson's driver's license and insurance information, and went back to her police car to run a check on the license. While the driver's license came back valid, the dispatcher notified Officer McMullen a person with the same name, date of birth, and general description as Ms. Nelson was wanted on a felony warrant in Ohio.[2] In addition, the suspect with the outstanding warrant had a tattoo on her chest. Hearing this report on the radio, Officer Paul Ratzlaff responded to the scene of the traffic stop to provide back-up to Officer McMullen. In the meantime, Officer McMullen returned to Ms. Nelson's vehicle, told Ms. Nelson they needed to discuss a matter, and asked Ms. Nelson to step out of her car. Officer Ratzlaff arrived while Ms. Nelson was

court.

[2] The felony warrant was actually issued in the name of a Ronee Breeding, who apparently used an alias of Ronee Nelson. Therefore, the suspect and Ms. Nelson shared only a possible last name. However, because Ms. Nelson did not depose any of the officers involved, our only record of the information actually relayed to Officer McMullen comes from her incident report, where she states "[t]he license came back valid but a felony warrant out of state.... I told Ms. Nelson that a felony warrant came back with her name ...." Ms. Nelson stated she remembered Officer McMullen telling her "a person with the same identities" had an outstanding warrant.

Ronee Breeding a/k/a Nelson was wanted for the underlying offense of aggravated burglary, which is a first degree felony in Ohio. *See* Ohio Rev. Code Ann. § 2911.11.

exiting her vehicle.[3]

Ms. Nelson got out of her vehicle and followed Officer McMullen to an area behind Ms. Nelson's vehicle and in front of Officer McMullen's police car. Officer McMullen explained the existence of the outstanding warrant in Ohio to Ms. Nelson. In response to several questions, Ms. Nelson told the officer she had not been in trouble, she did not have any outstanding warrants in her name, and she had not been to Ohio. Finally, Officer McMullen stated there was one way to be sure Ms. Nelson was not the person wanted in Ohio and asked Ms. Nelson if she had any tattoos.

When Ms. Nelson replied she did not have a tattoo, the officer explained the person wanted in Ohio did have a tattoo on her breast, and again asked if Ms. Nelson had a tattoo. At one point, Officer Ratzlaff also asked whether Ms. Nelson was sure she did not have a tattoo. When Ms. Nelson reiterated she did

---

[3] The parties disagree about when Officer Ratzlaff arrived and what actions he took upon arrival. They also disagree about how events unfolded after Officer McMullen informed Ms. Nelson of the Ohio suspect's tattoo. Because of the posture of this case on review, we will resolve any such disputes by viewing the facts in the light most favorable to Ms. Nelson and assuming the events occurred as she described them in her deposition testimony. *Romero v. Fay* 45 F.3d 1472, 1475 (10th Cir. 1995).

not have a tattoo, Officer McMullen stated, "I can take you down to the station," or "I'll take you downtown." Ms. Nelson adamantly refused to go to the police station, telling the officers she would not go "downtown" because she had done nothing wrong. Ms. Nelson stated in her deposition she was also concerned about her children, and what would happen to them if she accompanied the officers to the police station. When Ms. Nelson made it clear she did not wish to accompany the officers to the police station, Officer McMullen began insisting she would need to see Ms. Nelson's chest in order to confirm Ms. Nelson did not have a tattoo.

Ms. Nelson characterized Officer McMullen's requests as "demands" to see her breasts "right then and there," but she also admitted Officer McMullen never asked her to pull her shirt down. Instead, Officer McMullen limited her "demands" to stating, "I need to see." In addition, Ms. Nelson described the tone used by Officer McMullen as "firm," and stated "she kind of put her hand like on her hip or gun or something – or baton. I don't know what was on – and demanded right then." [4] After the officer took what Ms. Nelson perceived as a

---

[4] The following exchange appears later in Ms. Nelson's deposition:

Q: Did either individual, either officer, unholster his or her weapon?
A: No, not that I recall.
...

-5-

more insistent tone, Ms. Nelson grabbed the collar of her oversized tee shirt and pulled her shirt and bra down far enough to expose her breasts, including her nipples, to both officers. Ms. Nelson did not have a tattoo on her breasts. Officer McMullen radioed as much to her dispatcher and proceeded to write Ms. Nelson a citation for speeding. Officer Ratzlaff left the scene. Ms. Nelson guessed she was outside her vehicle for five to ten minutes.

Ms. Nelson sued Officer McMullen and Officer Ratzlaff individually pursuant to 42 U.S.C. § 1983, alleging the officers violated her constitutional right, under the Fourth and Fourteenth Amendments, to be free from an unreasonable search.[5] Officers McMullen and Ratzlaff moved for summary

---

Q: Do you think you would have recalled if somebody unholstered a weapon?
A: Well, she put her hand on her hip. I don't know if she unholstered her weapon or not.
Q: Do you even know what side she carries her firearm on?
A: No.
Q: What hand was on what hip?
A: She put both of them kind of –
Q: Well, kind of which – or kind of yes?
A: Let's see, she – maybe she had this – her left arm down. Her right arm I know went on her hip.

[5] Ms. Nelson brought several related claims, including a claim based on her First Amendment right to privacy, against the officers individually and in their official capacities, against the city, and against the Chief of Police. We limit our discussion to the § 1983 claim, specifically the reasonableness of the search, because it is the sole issue Ms. Nelson raises on appeal.

judgment, claiming Ms. Nelson could not establish a constitutional deprivation, and therefore the officers were entitled to qualified immunity. The district court balanced the need for the search against Ms. Nelson's privacy interest, found the officers did not violate Ms. Nelson's Fourth Amendment rights because Ms. Nelson chose the time, place, and manner of the exposure, and granted the motion for summary judgment. This timely appeal followed.

## STANDARD OF REVIEW

We review the district court's grant of qualified immunity on summary judgment de novo. *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1026 (10th Cir. 1994). "'Under the summary judgment standard, we review the evidence in the light most favorable to the nonmoving party.'" *Romero*, 45 F.3d at 1475 (quoting *Bisbee v. Bey*, 39 F.3d 1096, 1100 (10th Cir. 1994), *cert. denied*, 515 U.S. 1142 (1995)). "However, '[w]e review summary judgment decisions involving a qualified immunity defense somewhat differently than other summary judgment rulings.'" *Id*. (quoting *Hannula v. City of Lakewood*, 907 F.2d 129, 130 (10th Cir. 1990)). This difference arises from the unique nature of qualified immunity, which is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial. *See Albright v. Rodriguez*, 51

F.3d 1531, 1534 (10th Cir. 1995). Qualified immunity is more than a defense to liability – it acts as an immunity to suit, therefore, "the Supreme Court has repeatedly 'stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Id*. (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Id*. at 1534-35 (citations omitted). If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment – showing "that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Id*. at 1535 (quotation marks and citation omitted).

DISCUSSION

The district court did not reach the traditional summary judgment analysis because it found Ms. Nelson failed to meet the first prong of the qualified

immunity test: Ms. Nelson did not demonstrate Officers McMullen and Ratzlaff violated her Fourth Amendment rights. We agree.

The Fourth Amendment provides citizens the right to be free from unreasonable government searches. *See Bell v. Wolfish*, 441 U.S. 520, 558 (1979). "Of course, the specific content and incidents of this right must be shaped by the context in which it is asserted. For what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quotation marks omitted). Therefore, the crux of this case necessarily becomes an analysis of the reasonableness of the search conducted on Ms. Nelson.

We employ a familiar balancing test in order to determine whether a search was reasonable:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell*, 441 U.S. at 559. *See also Cottrell v. Kaysville City*, 994 F.2d 730, 734 (10th Cir. 1993); *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir. 1993). This test is fact-specific, "measured in objective terms by examining the totality of the

circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

We start from the irrefutable premise "that a strip search is an invasion of personal rights of the first magnitude." *Chapman*, 989 F.2d at 395. Undoubtedly, there are searches more intrusive than the exposure of one's breast in a public place, but we are hard-pressed to think of more than a few. Clearly, this must have been a humiliating experience for Ms. Nelson. On the other side of the equation, the government interest in confirming Ms. Nelson was not the suspect wanted on the outstanding felony warrant was significant as well. The suspect was wanted in connection with an aggravated burglary, which is a serious offense in Ohio.[6] Having heard the report from the dispatcher, the officers reasonably believed the suspect had the same name, birth date, and physical description as Ms. Nelson. *Cf. United States v. Shareef*, 100 F.3d 1491, 1503 (10th Cir. 1996) (holding when defendant shared last name, date of birth, sex, and race with suspect described in the Federal Bureau of Investigation's National Crime

---

[6] Aggravated Burglary is committing a burglary when any of the following conditions apply: "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another; (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control." Ohio Rev. Code Ann. § 2911.11 (aggravated burglary); Ohio Rev. Code Ann. § 2911.12 (burglary).

Information Center (NCIC) teletype, detention of defendant was reasonable).[7]
Given the circumstances, we certainly do not think the officers were obligated to
simply believe Ms. Nelson when she told them she was not the suspect, and let
her go on her way.

Nor do we believe the circumstances empowered the officers to conduct a
road-side strip search. In fact, we cannot conceive of a set of circumstances
allowing us to condone as reasonable an officer-imposed strip search in a public
area such as a city street in the middle of the afternoon. However, what makes
this case so unusual is the role Ms. Nelson played in choosing the manner and
place in which the search was conducted.[8]

---

[7] In her brief, Ms. Nelson continually emphasizes the match at issue in this
case involved only an alias last name. We place much less significance on this
fact than Ms. Nelson. In *Shareef*, we clearly allowed officers to rely on aliases
when determining whether an individual might be a suspect wanted on an
outstanding warrant. *See Shareef*, 100 F.3d at 1497, 1503, 1505 ("Although the
name in the NCIC teletype, Karlton Wilbur Smith, was not identical to the
defendant's name, William D. Smith, the report listed 18 aliases, of which several
[of the middle names in the aliases] resemble 'William,' and one of which [again,
a middle name in the alias] was 'Willie.'"). We find our logic in *Shareef*
instructive here.

[8] Our efforts to unearth a comparable case have been fruitless. In addition
to the unique role Ms. Nelson played in the search of her person, we have no
request for consent to search or a direct command that a search will take place,
and the reason for the search involves identity and not the search for weapons or
contraband. We highlight these unusual facts to stress the limited nature of our
holding.

As mentioned earlier, by the time Officer McMullen first stated she needed to see whether Ms. Nelson had a tattoo, Ms. Nelson had already rejected the option of accompanying the officers to the police station. Ms. Nelson admitted Officer McMullen never asked her, or commanded her, to pull down her tee shirt. Throughout her deposition, Ms. Nelson consistently states Officer McMullen only said "I need to see." In her brief, Ms. Nelson argues there is no functional difference between the language used by Officer McMullen and telling Ms. Nelson to pull down her tee shirt. We disagree.

"Pull down your shirt" is a direct command. "I need to see whether you have a tattoo" is more open-ended, a statement of an eventuality which must occur before any confusion can be cleared up. In other words, the words used by Officer McMullen left open for discussion the timing, place, manner, and extent of the search. Ms. Nelson chose to pull her shirt and bra down, she chose to pull them down far enough to expose her nipples, and she chose to pull them down while standing on the shoulder of a public street.

Ms. Nelson admits she did not ask Officer Ratzlaff to leave or turn around prior to pulling down her shirt. More importantly, nothing in the record suggests

Ms. Nelson said or did anything to indicate she was about to pull down her shirt. She made no request to find a different way of handling the situation. She did not question the propriety of exposing herself on the side of the road. She did not suggest Officer McMullen handle the search herself in the relative privacy of the back of her cruiser. She did not even mumble so much as an "O.K." to give the officers notice of what was about to happen. We do not mean to assign full responsibility for what transpired to Ms. Nelson. The point is any of these actions, in fact almost any action other than the spontaneous one taken by Ms. Nelson, would have led to the police officers exerting some level of control over the time, place, and manner of the exposure. Without a scintilla of evidence tending to show that control, we fail to see how Ms. Nelson can show the officers violated her constitutional rights.

While we hold the search here was reasonable under the circumstances, assuming events transpired as Ms. Nelson alleges, the officers clearly could have handled this situation better. For instance, we find it hard to believe Officer McMullen did not suggest she and Ms. Nelson discuss the tattoo inquiry in her police car as opposed to the side of the street. Perhaps the officer erred by not insisting Ms. Nelson accompany the officers to the police station. We also surmise a less intrusive and humiliating method of identification – social security

numbers, further investigation of the warrant specifics with other law enforcement agencies, or any number of avenues – could have been employed here. We realize we enjoy the substantial benefit of hindsight, nevertheless we have trouble characterizing the result of this particular stop as anything but a failure of the officers to control the situation and clearly communicate their intentions to Ms. Nelson.

However, because Ms. Nelson controlled the time, place, and manner of the search at issue here, we hold she cannot show Officers McMullen and Ratzlaff violated her constitutional rights. The officers are entitled to qualified immunity from suit, and summary judgment is appropriate. Accordingly, the district court is **AFFIRMED**.