**Julie SMITH, Individually and as Personal Representative of the Estate of Steven D. Smith, Plaintiff,**

**v.**

**Kenneth LEJEUNE, Individually, and Tanda Hicks, Individually, Defendants.**

**and**

**Julie Smith, Individually and as Personal Representative of the Estate of Steven D. Smith, Plaintiff,**

**v.**

**Board of Commissioners of Laramie County, Wyoming, et al.**

Nos. 01–CV–026–B, 00–CV–129–B.

United States District Court, D. Wyoming.

May 17, 2002.

Mitchell E. Osborn, Grant and Osborn, Cheyenne, WY, Brice A. Tondre, Denver, CO, for plaintiff.

Lisa B. Halstead, Kennedy & Christopher, Denver, CO, for Kenneth LeJeune, RN, defendant.

Paul Cooper, Cooper & Clough, Denver, CO, for Thomas J. Flower, D.O., defendant.

Judith A. Studer, Schwartz, Bon, Walker & Studer, Casper, WY, for Kay Thomas, RN, Ellen E. Barbour, defendants.

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

This action arises from the death of Plaintiff Julie Smith's husband while in custody at the Laramie County Detention Facility in Cheyenne, Wyoming. Now before the Court are the remaining Defendants' Motions for Summary Judgment based on the issue of qualified immunity. Other outstanding motions will be deemed moot by this order.

At the time of this Order, Plaintiff had previously reached a settlement agreement with the Board of Commissioners of Laramie County, Wyoming, and individual Defendants Allsop, Pederson, Davis and Lounsbury; the parties have stipulated to the dismissal of Plaintiff's claims against Sheriff Roger Allsop, in his capacity as Sheriff, and David Wood, individually; this Court dismissed Defendants William H. Bolden, and WHB Companies, Inc. by a previous Order on a Motion for Summary Judgment; Plaintiff has previously accepted an Offer of Judgment from Defendant Preferred Medical Correctional Team of Wyoming, Inc.; Nurse Tanda Hicks was never served with a summons and Complaint and has consequently been dismissed from suit; and Plaintiff has accepted an offer of judgment from Defendant LeJeune. Therefore, this Order will only address remaining Defendants, namely, Dr. Flower and nurses Thomas and Barbour, all in their individual capacities.

After reading the briefs, hearing oral arguments, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### Statement of Parties and Jurisdiction

Plaintiff Julie Smith is a resident of Wyoming and is the widow of Steven Smith. Defendant Flower was to provide supervision of medical care and evaluate programs, services and the adequacy of the treatment facilities at the Laramie County Detention Facility. Defendants Thomas and Barbour were nurses employed at the Laramie County Detention Facility. Jurisdiction of this Court has been invoked under 28 U.S.C. §§ 1343 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b).

### Background

#### Procedural Background

Plaintiff originally brought suit against Laramie County Board of Commissioners, *et al.* on July 7, 2000. This case was originally set to go to trial on July 16, 2001. The Court entered an order denying Summary Judgment on June 18, 2001. The Court entered a Supplemental Order on Summary Judgment on June 25, 2001. After a status conference on July 9, 2001, the Court issued another Order which vacated the trial date, vacated the Supplemental Order on Summary Judgment, stayed discovery and ordered the parties to re-brief the issue of qualified immunity. A hearing on Defendants Flower, Thomas, and Barbour's Motions for Summary Judgment based on qualified immunity was held on February 26, 2002. The original case was consolidated with the case by the Plaintiff against Nurses Kenneth LeJeune and Tanda Hicks on September 13, 2001. A hearing on Defendant LeJeune's Motion for Summary Judgment was held on April 12, 2002.

#### Factual Background

Steven Smith ("Smith") died in the Laramie County Detention Facility (the "Facility") on February 14, 1999. Former Defendant Laramie County Board of Commissioners owns and operates the Laramie County Detention Facility. Former Defendant City of Cheyenne contracts with the County to house prisoners at the Facility.

On February 12, 1999, Smith was taken into custody by Officer John C. Pederson ("Pederson") of the Cheyenne Police Department. Pederson suspected Smith of driving under the influence of alcohol after Smith was involved in an automobile accident. Smith's breath alcohol concentration was tested, revealing a concentration of .317.

Pederson took Smith to the Facility, where Smith received a preliminary medical exam from Defendant Kay Thomas ("Thomas"), a Licensed Practical Nurse employed at the Facility at approximately 10:45 p.m. on February 12, 1999. Smith was then placed in a holding cell.

Deputy Ed Davis came on duty at 6 a.m. on February 13, 1999. Deputy Davis asked Defendant Nurse Ellen Barbour ("Barbour") to evaluate Smith at around 11:30 a.m. on February 13, 1999. Smith was booked by Deputy David Wood on February 13, 1999 at approximately 1 p.m. After booking, Smith was transferred to the D–Pod section of the Facility. Between 6:00 and 10:00 p.m., Smith was in the common area of D–Pod. During this time, Deputy Richard Lounsbury ("Lounsbury") observed Smith. Thomas saw Smith during medical rounds at approximately 8:30 p.m. on February 13, 1999. Other inmates also had contact with or observed Smith during the time before the 10 p.m. lockdown. Former Defendant Nurse Hicks relieved Thomas at the end of her shift. Between 11:30 p.m. and 2:15 a.m., Lounsbury observed Smith get out of his bed to use the bathroom. Some time after that, but before 6:00 a.m. the following morning, Smith died in his cell. The autopsy indicated Smith died from an arrhythmia resulting from an electrolyte imbalance caused by fatty liver.[1]

Former Defendant Preferred Correctional Medical Team of Wyoming ("PCMT") was under contract to provide medical services at the Facility. PCMT contracted with Defendant Dr. Thomas Flower ("Flower") to supervise medical care, evaluate programs, services, and the adequacy of the treatment facilities. Former Defendant Nurse LeJeune was to assist Flower with his duties. LeJeune was the Medical Unit Administrator hired by PCMT. PCMT retained Nurses Thomas and Barbour to provide nursing services at the Facility. Plaintiff contends Flower failed to train and supervise personnel under his direction and control with respect to the appropriate treatment of alcohol withdrawal and its severe danger to a person suffering from its effects and that such deliberate indifference to the serious medical needs of Smith resulted in his death. Plaintiff contends that Nurses Thomas and Barbour were deliberately indifferent to the serious medical needs of Smith, resulting in his death.

Plaintiff asserts claims for civil rights violations pursuant to 42 U.S.C. § 1983; state law claims pursuant to the Wyoming Governmental Claims Act; and for medical negligence against the remaining Defendants. Defendants have made motions for summary judgment on the basis that they are entitled to qualified immunity from suit under 42 U.S.C. § 1983, and that the Court should then exercise its discretion to dismiss the pendant state law claims.

## *Discussion*

### *Qualified Immunity Standard*

■ Actions for damages provide an important remedy for individuals injured by the abuse of authority by governmental

---

1. The actual cause of death has been the subject of much dispute between the experts in this case. This dispute need not be settled in order to examine the facts of this case in accordance with the qualified immunity standards to be set out by the Court in this Order, *infra.*

officials. However, such actions have the potential to subject officials to costly and harassing litigation and inhibit officials in performing their official duties. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Courts recognize the affirmative defense of qualified immunity to balance these competing interests. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The United States Supreme Court emphasized the broad protection provided by the qualified immunity defense, explaining that it gives officials "a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.'" *Behrens v. Pelletier,* 516 U.S. 299, 308, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Consequently, courts should resolve the "purely legal question" of whether the qualified immunity defense is available *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), 'at the earliest possible stage in litigation.' *Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir.1995) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

■ Summary judgment motions in qualified immunity cases are evaluated differently than general summary judgment motions due to the underlying purposes of qualified immunity. *Nelson v. McMullen,* 207 F.3d 1202, 1205–06 (10th Cir.2000). After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a two-part test. *Scull v. New Mexico,* 236 F.3d 588, 595 (10th Cir. 2000); *Adkins v. Rodriguez,* 59 F.3d 1034, 1036 (10th Cir.1995). A court must determine whether the plaintiff has satisfied a "heavy two-part burden." *Albright,* 51

F.3d at 1534. The plaintiff must first establish "that the defendant's actions violated a constitutional or statutory right." *Albright,* 51 F.3d at 1534; see also *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (the court must first decide whether the plaintiff has alleged a deprivation of a constitutional right). If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct. *Albright,* 51 F.3d at 1534. In determining whether the right was "clearly established," the court must assess the objective legal reasonableness of the action at the time of the alleged violation and ask whether "the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Wilson,* 526 U.S. at 615, 119 S.Ct. 1692 (citations omitted).

■ The two-step analysis "is designed to 'spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" *Wilson,* 526 U.S. at 609, 119 S.Ct. 1692 (quoting *Siegert,* 500 U.S. at 232, 111 S.Ct. 1789). If the plaintiff does not satisfy either part of the two-part inquiry, the court must grant qualified immunity to the defendants. *Albright,* 51 F.3d at 1535. If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove " 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Id.* (quoting *Hinton v. City of Elwood,* 997 F.2d 774, 779 (10th Cir.1993)). Although a court reviews the evidence in the light most favorable to the nonmoving party, *Nelson,* 207 F.3d at 1205, the record must clearly demonstrate the plaintiff has satis-

fied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity. *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir.2001). In the case at bar, Plaintiff has not satisfied her heavy two-part burden, and thus the Court must grant qualified immunity to the remaining Defendants Flower, Thomas and Barbour.

 A prison official's deliberate indifference to an inmate's serious medical needs constitutes a violation of the Eighth Amendment.[2] *See Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause bf action under section 1983." *Id.* (citation omitted).

In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indiffer-

ence to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment.

*Id.* at 105–06, 97 S.Ct. 285 (internal citations omitted).

 Deliberate indifference involves both an objective and a subjective component. *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir.2000); *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The objective component is met if the deprivation is "sufficiently serious." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir.1999) (quoting *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980)).

 "The second, subjective portion of the *Farmer* test requires that the prison official show "deliberate indifference" to the existence of any risk inherent in exposure to the challenged conditions." *DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir.2001).

[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substan-

---

2. Smith was not a prisoner, he was a pretrial detainee at the time of his death. Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment. *Lopez v. LeMaster,* 172 F.3d 756, 759, note 2 (10th Cir.1999) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). In determining whether

Smith's rights were violated, however, the analysis applied is identical to that applied in Eighth Amendment cases brought pursuant to § 1983. *See Barrie v. Grand County, Utah,* 119 F.3d 862, 868 (10th Cir.1997); *Hare v. City of Corinth,* 74 F.3d 633, 643 (5th Cir. 1996).

tial risk of serious harm exists, and he must also draw the inference. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. The prison official must have this level of awareness because those officials "who lacked knowledge of a risk cannot be said to have inflicted punishment" in a manner that violates the Eighth Amendment. *DeSpain*, 264 F.3d at 975, (quoting *Farmer*, 511 U.S. at 844, 114 S.Ct. 1970). It is not enough to establish that the official should have known of the risk of harm. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. The test requires both knowledge and disregard of possible risks, a *mens rea* on par with criminal recklessness. *Id.* at 836, 114 S.Ct. 1970. "If an official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability under this standard." *DeSpain*, 264 F.3d at 975; *Farmer*, 511 U.S. at 844, 114 S.Ct. 1970; *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995). Each of these factors will be considered separately for each remaining Defendant in the case at bar.

### *I. Defendant Flower*

 Plaintiff contends that Flower failed to train and supervise personnel under his direction and control with respect to the appropriate treatment of alcohol withdrawal and its severe danger to a person suffering from its effects, which constituted deliberate indifference to the serious medical needs of Smith resulting in his death in violation of his constitutional rights as protected by 42 U.S.C. § 1983.

For the purposes of this order, it will be assumed without deciding that alcohol withdrawal is a sufficiently serious condition in order to meet the objective portion of deliberate indifference standard.[3] Even making this assumption, and assuming that Smith actually suffered from alcohol withdrawal, which is hotly disputed, Plaintiff has not sustained her burden of showing that Flower was deliberately indifferent to Smith's medical needs.

 "A supervisor is not liable under section 1983 unless an 'affirmative link' exists between the [constitutional] deprivation and either the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise.'" *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir.1988). In the case at bar, there are no allegations that Flower was ever actually contacted in connection with Smith's imprisonment until after Smith's death. Plaintiff's claim against Flower is based solely on a failure to train, supervise or implement adequate policies.

 "A supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Meade*,

---

3. Nonetheless, it could be argued that Smith did not have a sufficiently serious medical need ("A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.") *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir.1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980)) due to the fact that Smith's regular treating physician, Dr. Bindschadler, testified that Smith did not exhibit any of the numerous clinical signs that a person who has drank excessive amounts of alcohol over a long period of time would exhibit. *See* Bindschadler Dep., p. 16–18. Bindschadler further stated that he did not think that alcohol withdrawal was an issue of concern for Smith (Id. at 29), and that he only prescribed Librium for its anti-anxiety effects. Id. at 28. Therefore, there is a reasonable argument that Smith did not have a serious medical condition which was detectable prior to his death. In this regard, see also Deposition of Bindschadler, Expert Opinion of Dr. Bader, Expert Report of Dr. Gottula, Expert Report of Dr. Kosnett.

841 F.2d at 1527, citing *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 873–74 (6th Cir.1982), cert. denied, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). In the case at bar, the Plaintiff attempts to paint the picture that Flower failed to train the nurses on alcohol withdrawal by essentially mischaracterizing Flower's deposition testimony. Plaintiff concedes that policies and protocols were in place prior to Smith's death.[4] In his deposition, Flower stated that he conducted monthly staff meetings, during which time medical education was provided in addition to discussion of particular issues in regard to inmates. *See* Flower Dep., p. 24. Flower also testified that during these meetings, he and the nurses discussed medical problems including alcohol withdrawal, and that the nurses were provided with the policies regarding alcohol withdrawal.[5] *Id.* at 40–41. Flower and the nurses also discussed how to evaluate an inmate at the time they were booked in, including with regard to alcohol withdrawal. *Id.* at 45. Flower explains that the policy is a guideline for the nurses to help them evaluate inmates being admitted with alcohol intoxication, and that the nurses were to use their own judgment and training to decide if they needed to call Flower. *Id.* at 45–46. The Court cannot say that it is unreasonable for a doctor to rely on the training

and experience of Licensed Practical Nurses. Any other conclusion would be ludicrous, and devalue the fact that nurses are trained professionals.

Plaintiff argues that Flower "made no investigation of their [the nurses'] training and experience," citing to Flower's Deposition at page 54. *See* Plaintiff's Memorandum in Opposition to all Motions for Summary Judgment on the Issue of Qualified Immunity, p. 28. However, Flower does not say that he did not investigate the nurses' training and experience. In fact, Nurse Barbour graduated from nursing school in 1970 and has worked in some capacity as a nurse since her graduation— including twenty-one years with United Medical Center–West and since June of 1995 at the Facility. *See* Barbour Dep., p. 4–5. Nurse Thomas was licensed as a nurse in 1978 and has worked as a nurse since that time. *See* Thomas Dep., p. 5–6. Reliance on such training and experience is reasonable. Flower stated that prior to the date of Smith's death, he had met with the nurses at the Facility and was comfortable with their qualifications and understanding of the policies regarding procedures for evaluating inmates who possibly suffer from alcohol withdrawal, as well as the nurses' general competence as licensed professional nurses. *See* Flower Affidavit ¶ 7.

4. *See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, Nos. 5, 6, 7, 8, 9, 10, 11, 12, 13.

5. In particular, see Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, No. 12: Policy No. 700.01, which states in relevant part: Alcohol detoxification: 1. History: Inmate usually consumes large quantities of alcoholic beverages during the few days prior to admission, and is observed for signs of withdrawal, including shaking, nervousness, hallucinations and seizures. a. ask inmate of previous withdrawal history, including specific symptoms (e.g. shakes, hallucinations, seizures, last seizure). b. has inmate taken medications for

withdrawal? If so, what. c. time of last drink. d. take vital signs. e. evaluate for signs of trauma and injury and level of consciousness. 2. Physician: call if seizure or hallucination history or if vital signs unstable. 3. Education: encourage meals and lots of liquids. Notify if symptoms worsen. 4. Medication: Call Physician. a. Thiamine 100 mg po q d for 7 days; b. Vistaril 50mg qid for 3–5 days; c. Chlordiazepoxide (Librium) 50 mg state for acute withdrawal and 25 mg QID or 50 mg AID * 3 days and/or # b. 5. Watch: Start 15/30 minute watch. Cot or lower floor if seizure history. Record vital signs while on watch or meds. Send Inmate Behavior Report. (as reflecting hand-written amendments).

Further, it was also stated at the April hearing in this matter that Flower worked with the nurses on many occasions during the years of their service at the Facility, and had no reason to believe that they were not qualified to do their jobs. Plaintiff states that "Dr. Flower obviously did not perform an adequate job of instructing the nurses. . . ." *See* Plaintiff's Memorandum in Opposition to all Motions for Summary Judgment on the Issue of Qualified Immunity, p. 29. However, this is not the standard for supervisor liability. As stated above, only a *complete failure* to train or training that is *reckless* or *grossly negligent* will constitute the deliberate indifference required to disqualify a state actor from qualified immunity from suit. *Meade v. Grubbs,* 841 F.2d 1512, 1527 (10th Cir. 1988). The evidence in this case shows that Flower provided protocols and policies to deal with alcohol withdrawal, that Flower conducted monthly meetings with the nurses during which these policies and procedures were discussed, that training was conducted at the monthly meetings, that the nurses had many years of nursing experience, and that nothing of this sort had ever occurred previously which would have alerted Flower to any inadequacies in the policies or training that he provided at the Facility. The most that Plaintiff has been able to show through the evidence is that she disagrees with the sufficiency of the training or policies provided by Flower, but this does not satisfy the standard for showing the deliberate indifference of a supervisor. The evidence may support a claim for negligence or medical malpractice, but it does not support a claim that Flower completely failed to train or provided reckless or grossly negligent training.

Plaintiff's expert, Dr. Gottula, states in his deposition that if the policies put in place by Flower had been followed, Smith's death would have been prevented. *See* Gottula Dep., p. 130. Another of Plaintiff's experts, independent nurse consultant working in correctional health care, Jacqueline Moore, states that although she would have added things to the protocols that Flower had in place, they met the standard of care. *See* Moore Dep., p. 82–83. At worst, Plaintiff's expert Dr. Kosnett states that the "policies for medical intake screening and for alcohol withdrawal are not sufficiently protective of the health of the inmate with incipient or actual alcohol withdrawal because they do not set forth clear instructions for the nursing staff or other personnel. . . ." *See* March 2, 2001 letter to Plaintiff's Counsel Tondre, Plaintiff's Exhibit Appendix No. 40. Again, a difference of medical opinion as to the sufficiency of a policy does not constitute the level of gross negligence, recklessness or complete failure to train required to find that Flower was deliberately indifferent.

Plaintiff also argues that since minutes of the monthly meetings conducted by Flower have not been produced, training must not have taken place at these meetings. Such a speculative statement is not sufficient to contradict the express testimony of Flower, Barbour, and Thomas that such meetings did take place and that training was conducted at these meetings. Plaintiff's attempted reliance on F.R.E. 803(7) in furtherance of this allegation is also misplaced.[6] F.R.E. 803(7) allows the

---

**6.** F.R.E. 803 allows certain types of evidence to be admitted despite the hearsay rule. F.R.E. 803(7) states: Absence of entry in records kept in accordance with the provisions of paragraph (6). Evidence that a matter is not included in the memoranda reports, records, or data compilations, in any form, kept in accordance with the provisions of paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and

admission of evidence which demonstrates an absence or lack of evidence to be admitted as part of the case in whole. Merely allowing this evidence does not prove Plaintiff's assumption. Further, the lack of evidence in this case is not specifically reliable. Though the absence of documents which would help Defendants gives the Court a reason to pause, such speculation cannot contradict actual evidentiary testimony which is in existence—that of Flower, Barbour, and Thomas. The absence of minutes of the training meetings could also easily be explained, as it was at the April hearing, when Counsel for Defendants stated that such documents are simply not in the control of Defendants, and thus cannot be produced by them.

For all of the aforementioned reasons, and relying on the standard for summary judgment in a qualified immunity case, the Court finds that Plaintiff has not sustained her burden of showing the subjective element of a sufficiently culpable state of mind with regard to Defendant Flower. Flower would have had to be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must have also drawn that inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The evidence has failed to indicate such an awareness. Flower would have to have also drawn the above inference. *Id.* The evidence has also failed to show that Flower drew that inference. It is insufficient for a plaintiff to merely establish that a defendant *should have known* of a risk. *Id.* (emphasis added). In the present action, Plaintiff has only produced evidence to the effect that, in hindsight, the policies or training could have been different, or that Flower *should have known* of the possible risk posed by

his policies and training. This evidence fails to sufficiently show that Flower was reckless, grossly negligent, or completely failed to train the nurses. Plaintiff has not sustained her burden of showing that Flower's conduct rose to the level of deliberate indifference in order to satisfy the subjective element of an Eighth Amendment violation or its equivalent Due Process Violation. *See* footnote 2. Consequently, the Court finds that Plaintiff has failed to state a claim against Flower under the Eighth Amendment for deliberate indifference to Smith's medical needs. Plaintiff has not shown that any issue of fact remains as to whether Flower was deliberately indifferent under the subjective standard, and therefore, the Court need not reach the second prong of the two-prong inquiry as to whether the law was clearly established. *Gehl Group v. Koby,* 63 F.3d 1528, 1533 (10th Cir.1995). The Court thus **GRANTS** Defendant Flower's Motion for Summary Judgment based upon qualified immunity.

## II. Defendant Thomas

 Nurse Thomas performed an intake medical assessment of Smith at approximately 8:45 p.m. on February 12, 1999. *See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, No. 15. On this assessment form, Thomas noted, among other things, that Smith's blood pressure was 130/80, his pulse was 116, that he reported that he was on daily medication, that he did not have his medication with him, that he reported medical problems, that he reported high blood pressure, that his doctor was Dr. Bindschadler, and that Smith was very drunk. *Id.* Thomas next saw Smith when she was on medical rounds the fol-

preserved, unless the sources of information or other circumstances indicate a lack of trustworthiness.

lowing day, February 13, 1999. In her treatment/progress notes (*See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment No. 18), a late entry reports that Thomas called Smith to the medical cart to have him sign a medical release form for Dr. Bindschadler at approximately 8:30 p.m. During this encounter, Thomas noted that Smith's hands and face were very puffy, and that his hands were slightly shaking. *Id.* Thomas reported asking Smith if he had ever experienced alcohol withdrawal, to which he replied that he had not. *Id.* She asked how he was feeling and he told her "fine,[7] I am going to court in the morning and going to get out. My wife talked to Dr. Bindschadler and he said I should be fine without my blood pressure medication until I get released." *Id.* Thomas took Smith's blood pressure and found that it was 160/98, to which she reports he stated, "That's not too bad for me." *Id.*

At the end of her shift, Thomas noted on her report (*See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, No. 16) that Smith was very puffy, that his hands were shaking, that his blood pressure was 160/98, that he signed the medical release form, that he was going to court the next day, and that the medical release form should be faxed if Smith did not get released after court the next day.

In her deposition, Thomas stated that she followed protocol during her contacts with Smith. She stated that his pulse of 116 at the time of intake was a little elevated, but not tachycardic.[8] *See* Thomas Dep., p. 49–50. Thomas stated that Smith's blood pressure at intake was within the normal realm. *Id.* Thomas stated that Smith seemed like he had been drinking but was talking, walking and acting normal at intake. *Id.* at 48, 68. She stated that his breath alcohol concentration was not in the record and that she did not know what it was, but that she knew he had been arrested for DUI. *Id.* at 53–54, 68–69. Thomas admitted that she knew it was important to prevent a patient from going into alcohol withdrawal, but that she did not believe that Smith was in alcohol withdrawal. *Id.* at 55–56. Thomas stated that when she saw Smith later on medical rounds, his blood pressure was slightly elevated from the time of intake, but that it was not an uncommon increase. *Id.* at 74–75. Thomas considered that Smith may need his blood pressure medications but that Smith stated that he had spoken to his wife, who had spoken to his doctor, who had indicated that Smith would be fine until he was released from jail on Monday. *Id.* at 75. Thomas could not say one way or the other whether it

---

7. Additional evidence exists to show that Smith said that he was "fine." *See* Interview, Statement and Deposition of Deputy Lounsbury (Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, Nos. 42, 43, 44) which states that when Lounsbury saw that Smith was awake and walking around his cell sometime between midnight and 2:15 am on February 14, 1999, Lounsbury inquired if everything was okay and Smith replied in a coherent manner that it was and that he was simply up to use the bathroom. *See also* Deposition of Randy Johnson, p. 19–20 which states that although Smith seemed conversant, Smith never made any complaints about his physical condition or that he was feeling poorly. *See also* Deposition of Roger Reynolds, p. 8 which states that in response to a question that Reynolds posed to Smith as to whether he was ok, Smith responded that he was fine. *See generally Brigden v. State of Oklahoma,* 129 F.3d 130 (10th Cir.1997) (unpublished opinion) (taking into account inmate's own assessment of the danger to himself as applicable to the state of mind of defendants).

8. Tachycardia is one symptom of alcohol withdrawal. *See* Gottula Deposition.

would be okay for someone to be off of blood pressure medication for three days. *Id.* Thomas stated that she did not recall any other inmate speaking to her regarding Smith's condition. *Id.* at 90–92.

Statements were taken from the inmates that Smith encountered in the common area of D-pod during the evening of February 13, 1999, before and after dinner was served. *See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, Nos. 26, 29, 30, 34, 38, 39, 48, 49, 50, 51. Almost every inmate said that they observed Smith shaking. However, most inmates also observed Smith going about a regular course of activities during the evening before his death including sitting at a table, sitting on a couch, making his bed, taking a nap, watching television, eating dinner, drinking liquids, having conversations with other inmates, saying that he was "fine" in response to inquiries by inmates, and talking with Nurse Thomas during medical rounds. *Id., see also* Deposition of Rudy Hernandez, Deposition of Randy Johnson, Deposition of Roger Reynolds. Such observations go to authenticate the statement of Thomas that she did not think that Smith was experiencing alcohol withdrawal.

The protocol that Thomas was to follow said that alcohol withdrawal is characterized by shaking, nervousness, hallucinations and seizures. Though Smith likely exhibited some shaking, the other components of alcohol withdrawal as described in the Facility's protocol, Policy No. 700.01, were not present. Several physicians have also stated in this case that the symptoms of alcohol withdrawal include several factors beyond mere shaking, and that the symptoms are progressive. *See* Appendix A to Brief on the Issue of Good Faith Immunity of Defendants Kay Thomas and Ellen Barbour (collecting and summarizing

the symptoms of alcohol withdrawal from Policy 700.01, Dr. Ted Bader, Dr. Roderic Gottula, Jacqueline Moore, Dr. Michael Kosnett, Dr. Darryl Bindschadler, and Dr. Taylor Fithian, see also depositions of these physicians). Some inmates stated that Smith seemed confused (*See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, No. 34), or that he seemed to be antsy (See Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, No. 30). Such symptoms do not prove that Thomas was deliberately indifferent to a serious medical condition. Some inmates even said that Smith was experiencing withdrawals or DTs [9] (*See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, Nos. 26, 39, Deposition of Randy Johnson). However, it is telling to note that none of these inmates have medical degrees and Randy Johnson even said that the only thing he actually saw Smith do which indicated to him that Smith was experiencing DTs was shaking, and that since he believed DTs to be shaking and throwing up, Johnson said that he was wrong in his prior assumption. Johnson Dep., p. 18–20.

As explained above, Thomas had many years of nursing experience, including experience with alcohol withdrawal, by the time that Smith came under her care. She observed Smith's shaking, and knew that he was without blood pressure medication for a short time. She saw that he was puffy. Even when all of the statements by the other inmates are viewed in a light most favorable to Plaintiff, which the Court does with the realization that all such testimony has the potential to be fabricated, embellished, or merely the result of failed memory, no evidence exists to show that Smith exhibited the other medi-

---

9. Delirium tremens, a component of alcohol withdrawal, are often referred to as DTs.

cally recognized signs of alcohol withdrawal—the disregard of which could constitute deliberate indifference. Even assuming for the purposes of this order, without actually deciding, that Plaintiff has shown evidence to fulfill the objective component of deliberate indifference, namely that Smith had a medical need which was sufficiently serious (*Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir.2000)), Plaintiff has failed to sustain her burden of showing the subjective component of deliberate indifference, namely that Thomas had the requisite state of mind, "the knowledge and disregard of possible risks, a *mens rea* on par with criminal recklessness." *Farmer v. Brennan*, 511 U.S. 825, 826, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

■■■■■ Thomas may have been negligent in her treatment of Smith, however, Plaintiff has failed to present evidence that goes beyond mere disagreement with Thomas' assessment that Smith was not in danger of severe alcohol withdrawal. As stated above, activity which may state a claim for medical malpractice or negligence does not reach the level of deliberate indifference to defeat the defense of qualified immunity. *See Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment). "A fortiori, a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980) (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977); *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir.1976)). In the case at bar, Smith cannot dispute his own diagnosis or treatment, but the above statement could be applied to the statements of other inmates who observed Smith in the common area of D–Pod the evening before his death who stated that Smith was suffering from DTs or withdrawals. Even assuming that any one of these inmates told Thomas that they believed Smith was suffering from DTs or withdrawal, the evidence shows that Thomas disagreed with this assessment as Smith was not exhibiting any of the other, medically recognized signs of withdrawal, other than shaking. Therefore, the most that Plaintiff has shown is a difference of opinion among the inmates regarding Smith's condition and Thomas' medical assessment of Smith's medical condition. Such is not sufficient to sustain Plaintiff's burden of showing deliberate indifference on the part of Thomas. "[W]hen a prisoner does in fact receive medical care, he has no Eighth Amendment claim based merely on his disagreement with the nature of the diagnosis." *Alloway v. Wackenhut Correctional Facility*, 2001 WL 874183, 15 Fed.Appx. 743 (10th Cir.2001) (unpublished) citing *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir.1992); *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("matter[s] of medical judgment" do not give rise to § 1983 claim); *Ramos*, 639 F.2d at 575 (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir.1976) (same). Thomas provided her medical assessment of Smith upon his arrival at the Facility and during medical rounds the evening before Smith's death. She took his pulse, measured his blood pressure, had a discussion with him, and observed his condition. In her medical judgment, Smith was not in danger. Plaintiff has failed to show that Thomas maintained the requisite *mens rea* to establish that she acted with deliberate indif-

ference. Therefore, the other elements of the qualified immunity analysis need not be examined and Thomas' Motion for Summary Judgment based upon qualified immunity is **HEREBY GRANTED.**

### III. Defendant Barbour

 Nurse Barbour was called by Deputy Davis to evaluate Smith on February 13, 1999, and she saw Smith at approximately 11:30 a.m. that day. *See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, Nos. 32, 33. Davis reported that he called Barbour "to assess for possible detoxification." *See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, No. 32. In his deposition, Davis explained that he used the word detoxification, meaning the same to him as withdrawals, but did not believe that Smith was actually going into detoxification. Davis Dep., p. 25–26. In her treatment note, Barbour stated that she spoke with Smith and that Smith told her that he had a blood disorder and hypertension, and that his medication had recently been changed. *See* Appendix to Plaintiff's Memorandum in Opposition to All Motions for Summary Judgment, No. 15. Barbour noted that Smith's eyelids were very puffy, but that Smith stated that they "had been that way for a while." *Id.* Barbour noted that Smith said that he had been trying to quit drinking and that he asked about getting some Librium (medication used to treat alcohol withdrawal). *Id.* Barbour notes that Smith denied any history of suffering from alcohol withdrawal, and stated that he had never stopped drinking long enough to experience withdrawal. *Id.*

Plaintiff argues that these statements by Smith, when combined with the statements of Deputy Davis to the effect that Smith was shaking at the time of Barbour's evaluation, are sufficient to show deliberate indifference on Barbour's part to Smith's serious medical condition. The Court disagrees. The only medically recognized symptom of withdrawal that Smith exhibited was shaking, and in fact, Davis stated that the shaking was slight. Davis Dep., p. 26–27. Further, Smith denied a history of withdrawals, another medically recognized warning sign of future difficulty with alcohol withdrawal. There has been no evidence presented that Barbour had any reason to think that Smith was hallucinating, was exhibiting nervousness, or was experiencing seizures. According to the medical evidence, alcohol withdrawal does not simply have one symptom. As it appeared to Barbour, Smith's behavior did not present a situation necessitating further medical treatment. As stated previously with regard to Defendant Thomas, no evidence exists to show that Smith exhibited the other, medically recognized signs of alcohol withdrawal—the disregard of which could constitute deliberate indifference. Again assuming for the purposes of this order, without deciding, that Plaintiff has shown evidence to fulfill the objective component of deliberate indifference, namely that Smith had a medical need which was sufficiently serious (*Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)), Plaintiff has failed to sustain her burden with regard to the subjective component of deliberate indifference, that Barbour had the requisite state of mind, "the knowledge and disregard of possible risks, a mens rea on par with criminal recklessness." *Farmer v. Brennan*, 511 U.S. 825, 826, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). As with the other remaining Defendants, Barbour's actions may state a claim for medical malpractice or negligence, but do not rise to the requisite level of deliberate indifference. Therefore, the other elements of the qualified immunity analysis need not be examined and the Court **HEREBY GRANTS** Defendant Barbour's Motion for Summary Judgment based upon qualified immunity.

*Plaintiff's State Law and Common Law Claims*

As stated above, the Court has determined that Flower, Thomas, and Barbour are entitled to qualified immunity, and therefore, the Court dismisses Plaintiff's only federal claim, that based upon 42 U.S.C. § 1983. Therefore, the Court **HEREBY DECLINES** to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over Plaintiff's remaining state and common law claims for relief, and they are **HEREBY DISMISSED WITHOUT PREJUDICE.**

*Conclusion*

For all of the above stated reasons, the Court **FINDS** that Plaintiff has failed to sustain her heavy two-part burden to defeat the defense of qualified immunity asserted by the remaining Defendants. Plaintiff has not shown sufficient evidence to support that Flower, Thomas or Barbour disregarded the requisite knowledge of a serious medical condition to constitute deliberate indifference. Therefore, the Court need not examine the other elements of the qualified immunity analysis. Accordingly, the Court grants Defendants Flower, Thomas, and Barbour qualified immunity from suit under 42 U.S.C. § 1983, and **HEREBY GRANTS** Defendants Flower, Thomas, and Barbour's Motions for Summary Judgment based upon qualified immunity, and Plaintiff's federal law 42 U.S.C. § 1983 claim is **DISMISSED WITH PREJUDICE.** The Court further **ORDERS** that Plaintiff's state and common law claims are **DISMISSED WITHOUT PREJUDICE.** Finally, all other pending motions before this Court are hereby **DENIED AS MOOT.**