FILED
United States Court of Appeals
Tenth Circuit

October 31, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEAL**

**FOR THE TENTH CIRCUIT**
_____

DANIEL T. PAULY, as personal
representative of the estate of Samuel
Pauly, deceased; DANIEL B. PAULY,

     Plaintiffs - Appellees,

v.

RAY WHITE; MICHAEL MARISCAL;
KEVIN TRUESDALE,

     Defendants - Appellants,

and

STATE OF NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY,

     Defendant.

No. 14-2035

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:12-CV-01311-KG-JHR)**
_____

Mark D. Jarmie (Mark D. Standridge, on the brief), of Jarmie & Associates, Las Cruces, New Mexico, for Defendants-Appellants.

Lee R. Hunt, Hunt & Marshall, Santa Fe, New Mexico (Pierre Levy, O'Friel and Levy, P.C., Santa Fe, New Mexico, with him on the brief), for Plaintiffs-Appellees.

_____

Before **PHILLIPS, SEYMOUR,** and **MORITZ**, Circuit Judges.
_____

**SEYMOUR**, Circuit Judge.

_____

On a dark and rainy night in October 2011, Samuel Pauly was shot to death through the window of his rural New Mexico home by one of three state police officers who were investigating an earlier road rage incident on Interstate 25 involving his brother. On behalf of Samuel Pauly's estate, his father filed a civil rights action against the three officers, the State of New Mexico Department of Public Safety, and two state officials, claiming defendants violated his son's Fourth Amendment right against the use of excessive force.[1] After depositions were taken, the officers moved for summary judgment, asserting qualified immunity. The district court denied their motions, they appealed, and we affirmed. *Pauly v. White* (*Pauly I*), 814 F.3d 1060, 1084 (10th Cir. 2016). The Supreme Court granted certiorari, vacated our judgment, and remanded the case to us for further consideration. *White v. Pauly* (*Pauly II*), 137 S. Ct. 548 (2017). We now reverse.

---

[1] The father also asserted state law claims for negligent training (Count Two), wrongful death under the New Mexico Tort Claims Act (Count Three), and violation of New Mexico Constitution, art. II, § 10 (Count Four). Samuel Pauly's brother, Daniel Pauly, asserted a claim for loss of consortium (Count Five). The parties stipulated to dismissal of Count Two. Only the excessive force claim is at issue in this appeal.

# I

## Background

In reviewing an interlocutory appeal from the denial of qualified immunity, "we 'take, as given, the facts that the district court assumed when it denied summary judgment.'" *Morris v. Noe*, 672 F.3d 1185, 1189 (10th Cir. 2012) (quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)). To be sure, "[w]e may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." *Id.* (internal quotation marks omitted). When we recite the facts of the case, "we view the evidence in the light most favorable to the non-moving party." *Weigel v. Broad*, 544 F.3d 1143, 1147 (10th Cir. 2008) (internal quotation marks omitted). Accordingly, the following facts are taken directly from the material facts section in the district court orders denying qualified immunity,[2] where the court noted that its "recitation of material facts and reasonable references reflect the Plaintiffs' version of the facts as gleaned from the evidence of record and excludes facts, contested or otherwise, which are not properly before this Court in the motions for summary judgment." Aplt. App. at 693. As we explain below, *infra* at 16-18, 20-23, given the Court's

---

[2] The district court's recitation of the facts is identical in the order denying qualified immunity to Officers Mariscal and Truesdale and the separate order denying qualified immunity to Officer White. We therefore cite primarily to the latter order when setting out the facts.

determination in *Pauly II*, 137 S. Ct. at 552, we set out the facts here more fully than we did in *Pauly I*.

*A. Facts*

The incidents underlying this action started the evening of October 4, 2011, when Daniel Pauly became involved in a road rage incident with two females on the interstate highway going north from Santa Fe, New Mexico. One of the women called 911 to report a "drunk driver," claiming the driver was "swerving all crazy" and turning his lights off and on. Aplt. App. at 694. The women then started to follow Daniel on Interstate 25, apparently tailgating him.

Daniel pulled his truck over at the Glorieta exit, as did the female driver of the car. Daniel felt threatened by the women and asked them why they were following him with their bright lights on. During this confrontation one of the women claimed Daniel was "throwing up gang signs." *Id.* He then left the off-ramp and drove a short distance to the house where he lived with his brother, Samuel. The house is located in a rural wooded area on a hill behind another house.

At some point between 9:00 and 10:00 p.m., a state police dispatcher notified Officer Truesdale about the 911 call. Officer Truesdale proceeded to the Glorieta off-ramp to speak to the women about the incident. Officers Mariscal and White also headed to the off-ramp to assist Officer Truesdale. Daniel was gone when Officer Truesdale arrived on scene. The women told Officer Truesdale that Daniel was driving recklessly. They described his vehicle as a gray Toyota pickup truck and provided dispatch with his

4

license plate number. Dispatch notified Officer Truesdale that the Toyota pickup truck was registered to an address on Firehouse Road near the Glorieta off-ramp.

The women then went on their way and, at that point, "any threat to [them] was over." *Id.* at 676. Officers White and Mariscal arrived to join Officer Truesdale. The officers all agreed that there was not enough evidence or probable cause to arrest Daniel, and that no exigent circumstances existed at the time. Nevertheless, the officers decided to try and speak with Daniel to get his side of the story, "to make sure nothing else happened," and to find out if he was intoxicated. *Id.* at 677. Officers Truesdale and Mariscal decided they should take separate patrol units to the Firehouse Road address in Glorieta to see if they could locate Daniel's pickup truck. Officer White stayed at the off-ramp in case Daniel returned. It was dark and raining by that time.

Officers Mariscal and Truesdale proceeded to the Firehouse Road address and parked along the road in front of the main house. This occurred at 11:14 p.m. Both vehicles had their headlights on and one vehicle had its takedown lights on, but neither vehicle had activated its flashing lights. The officers did not see Daniel's truck at the main house, but they noticed a second house behind it with its interior lights and porch lights on. They decided to approach the second house in an attempt to locate Daniel's pickup truck. As they walked towards that house, the officers did not activate their security lights.

To maintain officer safety, Officers Mariscal and Truesdale approached the second house in a manner such that neither brother knew the officers were at the property. The officers did not use their flashlights at first, and then only used them intermittently.

5

Officer Truesdale turned on his flashlight as he got closer to the front door of the brothers' house. Through the front windows, the officers could see two males moving inside the house. When they located Daniel's Toyota pickup truck, they contacted Officer White to so advise him. Officer White then left to join them.

At 11:16 p.m., Officer White arrived on the scene. He radioed dispatch to inform them that all units were at the residence, and he confirmed with dispatch that the suspect vehicle was there. At 11:17, Officer White can be seen on Officer Truesdale's COBAN video[3] as "he beg[an] to walk down the road a few steps before turning around and heading out of sight up the driveway leading to a residence." *Id.* at 164. Officer White testified that the reason he changed directions was because he "began to hear Officer Mariscal and Officer Truesdale announcing, 'New Mexico State Police,' from the rear of th[e] property." *Id.* at 216.

From the Pauly brothers' perspective, the officers' approach to their residence was confusing and terrifying. The brothers could see "through the front window two blue LED flashlights, five or seven feet apart, at chest level, coming towards the house." *Id.* at 678. Daniel could not tell who was holding the flashlight approaching the house because of the dark and the rain, but he feared it could be intruders related to the prior road rage altercation. "[I]t did not enter Daniel Pauly's mind that the figures could have been police officers." *Id.* The brothers hollered several times, "Who are you?" and, "What do you want?" *Id.* In response, the officers laughed and said: "Hey, (expletive), we got you

---

[3] Each police cruiser had a dashboard video camera, which is referred to as a COBAN video, named after COBAN Technologies, the manufacturer.

surrounded. Come out or we're coming in." *Id.* Officer Truesdale also shouted once, "Open the door, State Police, open the door," while Officer Mariscal said, "Open the door, open the door." *Id.* at 678-79. But Daniel did not hear anyone say "State Police" until after the entire altercation was over. *Id.*

Fearing for their lives and the safety of their dogs, the brothers decided to call the police to report the unknown intruders. Before Daniel could call 911, however, he heard someone yell: "We're coming in. We're coming in." *Id.* at 679. Believing that an invasion of their home was imminent, Samuel retrieved a loaded handgun for himself as well as a shotgun and ammunition for Daniel. Daniel told his brother he would fire some warning shots while Samuel went back to the front of the house. One of the brothers then hollered, "We have guns," *id.* at 679, and the officers subsequently saw an individual run to the back of the house. Officer Truesdale proceeded to position himself towards the rear of the house and shouted, "Open the door, come outside," *id.,* while Officer White drew his weapon and took cover behind a stone wall fifty feet away from the front of the house and Officer Mariscal took cover behind one of the brothers' trucks.

Because of the prior threatening statements made by Officers Truesdale and Mariscal, Daniel did not feel comfortable stepping out of the front door to fire warning shots. But a few seconds after the officers heard "We have guns," *id.* at 680, Daniel stepped partially out of the back door and fired two warning shots while screaming loudly to scare anyone off. Officer White thought Officer

7

Truesdale had been shot after hearing the two shotgun blasts.[4] A few seconds after Daniel fired the warning shots, Officers Mariscal and White observed Samuel open the front window and point a handgun in Officer White's direction. Officer Mariscal testified he immediately shot at Samuel but missed. "Four to five seconds after Samuel Pauly pointed his handgun at Officer White, Officer White shot Samuel" from his covered position fifty feet away. *Id.* at 681. The entire incident took less than five minutes.

---

[4] Officer White testified in his deposition that after he heard the shots at the back of the house, "I believed Officer Truesdale had been shot at that point, being that I believed he was at the rear of the residence." Aplt. App. at 223. He also admitted, however, that "I did not hear anything that would suggest a person had been hit." *Id.*

## B. Procedural History

Daniel T. Pauly (Daniel and Samuel's father), as the personal representative of the Estate of Samuel Pauly, and Daniel B. Pauly on behalf of himself (hereinafter "plaintiffs"), filed suit against Officers Mariscal, Truesdale, and White, the State of New Mexico Department of Public Safety ("NMDPS"), and two state officials. Plaintiffs alleged an excessive force claim under 42 U.S.C. § 1983 as well as several state law claims. They sought compensatory damages, punitive damages, pre- and post-judgment interest, costs, and attorneys' fees. Relevant here is plaintiffs' § 1983 claim against all three officers for violating Samuel Pauly's Fourth Amendment right to be free from excessive force.

All three officers moved for summary judgment and raised the defense of qualified immunity with respect to the § 1983 excessive force claim. Defendants analyzed the excessive force claim by reviewing the actions of each deputy individually, not their actions as a whole. They all argued they were entitled to qualified immunity.

Specifically, Officer White asserted that when Samuel pointed the gun in his direction, deadly force was justified under the totality of the circumstances because any police officer would have reasonably assumed his life was in danger whether or not Samuel intended to fire. He contended it was not feasible for him to warn Samuel to drop his weapon.

Officer Truesdale argued it was undisputed that he did not fire his weapon at Samuel Pauly and therefore he could only be liable if his pre-seizure conduct "created the need for deadly force in this incident through his own reckless, deliberate conduct" that

9

"was immediately connected to Officer White's use of force in self-defense." Aplt. App. at 359. He then argued that his actions leading up to the use of force were reasonable and that even if he made mistakes in how he approached the house, none of his conduct preceding the use of force by Officer White was reckless or deliberate. He further claimed his actions were not the but-for or proximate cause of Samuel's death because the brothers' own actions were "independent and unexpected intervening events" amounting to a superseding cause of death that defeated any liability on his part. *Id.* at 363-64.

Officer Mariscal argued that when he saw Samuel point the gun at Officer White, "he was clearly justified in using deadly force in defense of Officer White's life." *Id.* at 392-93. Like Officer Truesdale, Officer Mariscal contended that his actions leading up to the use of force were not reckless or deliberate, and that his pre-seizure conduct was not the but-for or proximate cause of Samuel's death.

The district court issued two orders, denying summary judgment on all claims. In its first order, the court denied Officer White qualified immunity, concluding that "the record contains genuine disputes of material fact regarding whether the Officers' conduct prior to the shooting of Samuel Pauly was at the very least reckless and unreasonably precipitated Officer White's need to shoot Samuel Pauly." *Id.* at 684. Based on the record, the court also determined that

> it is disputed whether (1) the Officers adequately identified themselves, either verbally or by using a flashlight; (2) the brothers could, nonetheless, see the Officers considering the ambient light and other light sources; and (3) it was feasible for Officer White to warn Samuel Pauly before shooting him.

10

Furthermore, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find the following: there were no exigent circumstances requiring the Officers to go to Daniel Pauly's house at 11:00 p.m.; Officers Truesdale and Mariscal purposefully approached the house in a surreptitious manner; despite the porch light and light from the house, the rain and darkness made it difficult for the brothers to see who was outside their house; the fact that the brothers' house is located in a rural wooded area would have heightened the brothers' concern about intruders; the Officers provided inadequate police identification by yelling out "State Police" once; the Officers' use of a hostile tone in stating, "we got you surrounded. Come out or we're coming in" was threatening; statements by Officers Truesdale and Mariscal of "open the door" and other statements of "we're coming in" were, likewise, threatening; it would have been reasonable for the Officers to conclude that Daniel Pauly could believe that persons coming up to his house at 11:00 p.m. were connected to the road rage incident which had occurred a couple of hours previously; that under these circumstances, the occupants of the house would feel a need to defend themselves and their property with the possible use of firearms; and the incident occurred in less than five minutes.

*Id.* at 684-85. The court made virtually the same determinations in its separate order denying qualified immunity to Officers Truesdale and Mariscal. *Id.* at 703-04.

All three officers appealed the denial of their qualified immunity, and we affirmed. *Pauly I*, 814 F.3d at 1084. We analyzed Officers Mariscal and Truesdale together and Officer White by himself because the "facts and circumstances" warranted it. *Id.* at 1071. The main reason we separated the qualified immunity inquiries is because we viewed Officer White's role in the altercation as completely disconnected from the roles of Officers Mariscal and Truesdale. For instance, in the background section, we stated that Officer White "arrived just as one of the brothers said: 'We have guns.'" *Id.* at 1066. Later, when analyzing the reasonableness of Officer White's conduct, we stated the following:

11

> Officer White did not participate in the events leading up to the armed confrontation, nor was he there to hear the other officers ordering the brothers to "Come out or we're coming in." Aplt. App. at 678. Almost immediately upon Officer White's arrival, one of the brothers shouted "We have guns." The alleged reckless conduct of Officers Mariscal and Truesdale prior to this point cannot be attributed to Officer White, and accordingly, our analysis focuses only on the reasonableness of his own conduct.

*Id.* at 1076.

In regard to Officers Mariscal and Truesdale, we started by analyzing their pre-seizure conduct to determine whether they had "caused" Samuel Pauly to be subjected to a constitutional deprivation. *Id.* at 1072. Relying on *Trask v. Franco*, 446 F.3d 1036 (10th Cir. 2006), we stated that "Officers Mariscal and Truesdale may be held liable if their conduct immediately preceding the shooting was the "but-for" cause of Samuel Pauly's death, and if Samuel Pauly's act of pointing a gun at the officers was not an intervening act that superseded the officers' liability." *Id.* We concluded that summary judgment was not appropriate regarding Officers Mariscal's and Truesdale's claimed entitlement to qualified immunity because "disputed facts remain[ed] concerning whether the officers properly identified themselves and whether the brothers knew Officers Mariscal and Truesdale were intruders or state police." *Id.* at 1074. In regard to whether Officers Mariscal and Truesdale had violated clearly established law, we relied on *Trask* again and held that it had been clearly established since 2006 that an officer would be held liable for any conduct that is the proximate cause of a constitutional deprivation. *Id.* at 1075-76.

12

Turning to Officer White, we stated that the case "present[ed] a unique set of facts and circumstances, particularly in the case of Officer White who arrived late on the scene and heard only 'We have guns,' aplt. app. at 680, before taking cover behind a stone wall fifty feet away from the Paulys' residence." *Id.* at 1077. We started by reiterating the Supreme Court's instruction that in excessive force cases, courts should determine an officer's reasonableness by "balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). In doing so, we looked to the three non-exclusive factors articulated in *Graham v. Connor*, 490 U.S. 386, 396 (1989), as well as the four factors listed in *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008), and determined that a reasonable jury could find that Officer White's conduct was objectively unreasonable and violated the Fourth Amendment. *Pauly I*, 814 F.3d at 1082.

We next turned to whether the law was clearly established at the time of Officer White's possible violation. We noted that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 1083 (quoting *Saucier v. Katz*, 53 U.S. 194, 202 (2001)). We relied on *Graham*, 490 U.S. at 396, *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985), and their Tenth Circuit progeny for the general proposition that the reasonableness of an officer's use of force depends, in part, on "whether the officer[] [was] in danger at the precise moment that [he] used force," *Pauly I*, 814 F.3d at 1083 (quoting *Allen v. Muskogee*, 119 F.3d 837, 840

13

(10th Cir. 1997)), and that "if [a] suspect threatens [an] officer with a weapon . . . deadly force may be used if necessary to prevent escape, and *if, where feasible*, some warning has been given," *id.* (quoting *Garner*, 471 U.S. at 11-12).

Recognizing that the Supreme Court has cautioned lower courts not to define clearly established law too generally, *see, e.g.*, *Mullenix v. Luna*, 136 S. Ct. 305 (2015), we stated the following:

> Notably, in *Brosseau* [*v. Haugen*]*,* 543 U.S. [194,] 199, 125 S. Ct. 596 [(2004) (per curiam)], a case decided in 2004, the Court reversed the Ninth Circuit's denial of qualified immunity, holding that using the "general" test for excessive force cases from *Garner,* 471 U.S. at 85, 105 S. Ct. 1694, was "mistaken." The Court explained that the Ninth Circuit erred in finding "fair warning in the general tests set out in *Graham* and *Garner,*" because "*Graham* and *Garner,* following the lead of the Fourth Amendment's text, are cast at a high level of generality." *Id.* at 199, 125 S. Ct. 596. Rather, the Court explained that the relevant inquiry was whether it was clearly established the officer's conduct was prohibited by the Fourth Amendment in the specific "situation [Brosseau] confronted." *Id.* at 199-200, 125 S. Ct. 596. Most significantly, the Court cited *Hope* [*v. Pelzer*]*,* 536 U.S. [730,] 738, 122 S. Ct. 2508 [(2002)], for the proposition that "of course, in an obvious case, [the *Garner* and *Graham*] standards can 'clearly establish' the answer, even without a body of relevant case law." *Id.* at 199, 125 S. Ct. 596. Nothing in *Mullenix* [*v. Luna*, 136 S. Ct. 305 (2015)] overruled *Hope* on this point.
>
> Building on the Court's decision in *Hope,* our decision in *Casey* [*v. City of Federal Heights*,] decided almost three years after *Brosseau,* explained that "[t]he *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." 509 F.3d [1278,] 1284 [(10th Cir. 2007)] (internal quotation marks omitted). We explained that "[w]e therefore adopted a sliding scale to determine when law is clearly established," *id.,* stating that "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004)).

14

Taking the facts as the district court determined them in the light most favorable to plaintiff estate, we are presented with this situation: an officer outside someone's home in the dark of night with no probable cause to arrest anyone and behind the cover of a wall 50 feet away from a possible threat, with no warning shot a man pointing his gun out of his well-lighted window at an unknown person in his yard while the man's brother fired protective shots in the air from behind the house. Given his cover, the distance from the window, and the darkness, a reasonable jury could find that Officer White was not in immediate fear for his safety or the safety of others. Any objectively reasonable officer in this position would well know that a homeowner has the right to protect his home against intruders and that the officer has no right to immediately use deadly force in these circumstances. Based on our sliding scale test established in *Casey*, 509 F.3d at 1284, we do not agree with the dissent that more specificity is required to put an objectively reasonable officer on fair notice.

Accordingly, accepting as true plaintiff estate's version of the facts, a reasonable officer in Officer White's position should have understood, based on clearly established law, that (1) he was not entitled to use deadly force unless he was in danger at the exact moment of the threat of force and (2) he was required, under the circumstances here, to warn Mr. Pauly to drop his weapon.

*Pauly I*, 814 F.3d at 1083-84.

Judge Moritz dissented. First, she believed that Officer White's actions were objectively reasonable: "In my view, no objectively reasonable officer in Officer White's circumstances and with White's knowledge of these circumstances could have been expected to hold his fire. *Id.* at 1088 (Moritz, J., dissenting). And, even assuming Officer White's use of deadly force was objectively unreasonable, she disagreed with our conclusion that the law was clearly established, arguing there was not a case that put the question "beyond debate." *Id.* at 1090 (quoting *Mullenix*, 136 S. Ct. at 311).

After concluding that Officer White should be entitled to qualified immunity, she stated the following in regard to Officers Mariscal and Truesdale:

15

> Because I would conclude that Officer White didn't violate Samuel Pauly's Fourth Amendment right to be free from the use of excessive force, and, alternatively, didn't violate clearly established law governing the use of deadly force, I would also conclude that Officers Truesdale and Mariscal are entitled to qualified immunity. *See, e.g., Hinkle v. City of Clarksburg,* 81 F.3d 416, 420–21 (4th Cir. 1996) (explaining jury's finding that shooting officer didn't use excessive force absolved non-shooting officers of liability); *McLenagan* [*v. Karnes*], 27 F.3d [1002,] 1008 [(4th Cir. 1994)] (explaining that even if non-shooting officer's action or failure to act contributed to use of force, issue of liability was mooted by finding that shooting officer didn't use constitutionally excessive force).

*Id.* at 1091.

After we issued our opinion, the officers filed a petition for rehearing en banc, which was denied. *Pauly v. White*, 817 F.3d 715 (10th Cir. 2016). In a dissent from denial, Judge Hartz noted that he was "unaware of any clearly established law that suggests . . . that an officer . . . who faces an occupant pointing a firearm in his direction must refrain from firing his weapon but, rather, must identify himself and shout a warning while pinned down, kneeling behind a rock wall." *Id.* at 718. The officers then petitioned the Supreme Court for certiorari.

The Court granted their petition, vacated our judgment, and remanded the case for further proceedings consistent with its opinion. *Pauly II*, 137 S. Ct. at 553. The Court focused entirely on our analysis of whether Officer White violated clearly established law. *Id*. at 552. It noted that "[q]ualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" and while this rule "do[es] not require a case directly on point," it does require that "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. at 551 (alteration in original) (quoting

16

*Mullenix*, 136 S. Ct. at 308). Accordingly, the Court criticized our reliance on *Garner* and *Graham*, which "lay out excessive-force principles at only a general level" and "do not by themselves create clearly established law outside 'an obvious case.'" *Pauly II*, 137 S. Ct. at 552 (quoting *Brosseau,* 543 U.S. at 199).

Our error, the Court concluded, was that we "failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." *Id*. at 552. The Court stated the following in regard to the facts of this case:

> Clearly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures, such as officer identification, have already been followed. No settled Fourth Amendment principle requires that officer to second-guess the earlier steps already taken by his or her fellow officers in instances like the one White confronted here.

*Id.*

As mentioned above, the Court's holding only addressed whether Officer White violated clearly established law; it did not address our opinion in regard to Officers Mariscal and Truesdale, nor did it address whether Officer White's use of deadly force was objectively reasonable. *Id.* Notably, the Court mentioned an argument advanced by Mr. Pauly as an alternative ground for affirmance:

> [R]espondents contend Officer White arrived on the scene only two minutes after Officers Truesdale and Mariscal and more than three minutes before Daniel's shots were fired. On the assumption that the conduct of Officers Truesdale and Mariscal did not adequately alert the Paulys that they were police officers, respondents suggest that a reasonable jury could infer that White witnessed the other officers' deficient performance and should have realized that corrective action was necessary before using deadly force.

17

*Id.* The Court declined to reach Mr. Pauly's argument because it appeared that neither we nor the district court had addressed it. *Id.*

In a short concurrence, Justice Ginsburg summarized her understanding of the Court's opinion:

> I join the Court's opinion on the understanding that it does not foreclose the denial of summary judgment to Officers Truesdale and Mariscal. See 814 F.3d 1060, 1068, 1073, 1074 (CA10 2016) (Court of Appeals emphasized, repeatedly, that fact disputes exist on question whether Truesdale and Mariscal "adequately identified themselves" as police officers before shouting "Come out or we're coming in" (internal quotation marks omitted)). Further, as to Officer White, the Court, as I comprehend its opinion, leaves open the propriety of denying summary judgment based on fact disputes over when Officer White arrived at the scene, what he may have witnessed, and whether he had adequate time to identify himself and order Samuel Pauly to drop his weapon before Officer White shot Pauly. Compare *id.,* at 1080, with *ante,* at 552-53. See also Civ. No. 12–1311 (D NM, Feb. 5, 2014), pp. 7, and n. 5, 9, App. to Pet. for Cert. 75–76, and n. 5, 77 (suggesting that Officer White may have been on the scene when Officers Truesdale and Mariscal threatened to invade the Pauly home).

*Id.* at 553 (Ginsburg, J., concurring).

### III

### Plaintiffs' New Argument

After reading plaintiffs' brief in opposition to the officers' petition for certiorari and plaintiffs' supplemental brief to us after the Supreme Court vacated our judgment, we are convinced that we misstated the facts in *Pauly I.* Originally, we had the following view of Officer White's role in the altercation: "Officer White did not participate in the events leading up to the armed confrontation, nor was he there to hear the other officers ordering the brothers to 'Come out or we're coming in.' Almost immediately upon

18

Officer White's arrival, one of the brothers shouted 'We have guns.'" *Pauly I*, 814 F.3d at 1076 (internal citations omitted).

But this was not an accurate portrayal of the events that unfolded on that rainy night in rural New Mexico almost six years ago. Unfortunately, we were misled by defendant's briefs on appeal. For instance, Officer White's opening brief stated, "Officer White did not arrive at the Paulys' house until just before one of the Pauly brothers yelled out 'We have guns.'" Aplt. Br. at 9. From the beginning, defendants framed the case as one where Officer White entered the situation without participation in, or knowledge of, the alleged reckless conduct of the officers that escalated into a gunfight, and plaintiffs responded accordingly. Our review of the record on remand shows otherwise. It turns out that if the facts are viewed in the light most favorable to plaintiffs, Officer White's reckless or deliberate conduct unreasonably created a need for him to shoot Samuel Pauly.

The officers claim that the "Paulys should not be allowed to raise [a] new theory[] on appeal that [they] never raised in the district court." Aplt. Supp. Br. at 9. We reject this contention. First, plaintiffs alleged from the beginning that all three officers' actions precipitated the eventual need to use deadly force, asserting in the complaint that "Defendants White, Mariscal, and Truesdale's decision to storm the Pauly residence and to create a dangerous and hostile situation was unreasonable." Tr. Doc. 1-3 at 7. Second, plaintiffs listed as an additional statement of material fact in its brief in opposition to Officer White's motion for summary judgment that "Officer White arrived on the scene two minutes before the shooting," Aplt. App. at 554, and also asserted that Officer White

19

took part in yelling at and threatening the brothers, *id.* at 556 ("Officers White and Mariscal were yelling 'Open the door' at the front of the house and Officer Truesdale was yelling 'Come outside' at the rear of the house. The *officers* yelled to the Pauly brothers to 'Come out or we are coming in!' or 'If you don't come out, we'll come in.'" (emphasis added) (internal citations omitted)). Third, the district court based its denial of summary judgment on the fact that Officer White took part in the alleged reckless events leading up to Officer White's use of deadly force: "Accepting Plaintiffs' version of the facts, a reasonable person in Officer White's position would have understood that the reckless actions of the Officers, including his own reckless actions, unreasonably precipitated his need to shoot Samuel Pauly . . . ." *Id.* at 687. Fourth, even assuming the argument was not sufficiently made below, "[w]e have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal." *Jordan v. U.S. Dep't. of Justice*, 668 F.3d 1188, 1200 (10th Cir. 2011) (quoting *Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011)). Finally, and most importantly, we were misled by the erroneous assertions about the record that defendants made to us on appeal.

The record supports the claim that Officer White may have recklessly participated in the events leading to Samuel Pauly's death. For instance, Officer Truesdale's COBAN recording, and the corresponding transcript which was reproduced in the McFaul Report, *see* Aplt. App. at 164, indicates that Officer Truesdale's camera was activated at 11:14 p.m. Officer Truesdale also stated in his deposition that he turned on the recorder "[w]hen [he] exited [his] vehicle" and proceeded toward the residence. *Id.* at 249.

20

Officer Truesdale's in-car microphone picked up Officer White's call stating that "all units are at the residence" at 11:16 p.m., indicating that Officer White arrived on the scene at that time. *Id.* at 164. At 11:17 p.m., "Officer White c[a]me[] into the camera's view on Firehouse road [and] he beg[an] to walk down the road a few steps before turning around and heading out of sight up the driveway leading to a residence." *Id.* at 164. When he was asked why he changed directions and started moving toward the house, Officer White stated, "I began to hear Officer Mariscal and Officer Truesdale announcing, 'New Mexico State Police,' from the rear of this property. So I began to proceed to that location." *Id.* at 216. Thus, Officer White heard the other two officers mere seconds past 11:17 p.m. and proceeded to join them.

The next audio that was picked up on the COBAN recording was at 11:18:07, when Officer Truesdale shouted something inaudible, but "at 11:18:12 [h]e yell[ed] 'State Police'" and at "11:18:18 [h]e yell[ed] 'Open the door.' Immediately after Officer Truesdale's statement Officer Mariscal's voice can be heard saying 'He's running.'" *Id.* at 164. This account was corroborated by Officer Truesdale during his deposition:

> Q: How many times did you try to communicate with the people inside the residence?
> A: Approximately three times.
> Q: Okay. Approximately three times. What did you say those three times?
> A: "State Police, come out."
> Q: Did you say the same thing three times?
> A: "State Police, come out. State Police, come out."
> Q: Okay.
> A: "Come out, or we're coming in."
>                                     * * *
> Q: How long were you at the side of the truck, shouting to the people inside the house?
> A: A short time. It was a few moments. I don't remember the exact time.

21

Q: A few moments before what?
A: Before I saw somebody run down the center of the house.
Q: All right. And when you saw somebody run down the center of the house, what did you do?
A: Officer Mariscal told me, "He's running." I said, "I know," and I ran out this direction, back towards the back of the house."

*Id.* at 254.

Officer Truesdale later said that the brothers did not announce they had guns until sometime after all the action that was picked up by the COBAN recording between 11:18:07 and 11:18:18:

Q: Okay. When you heard somebody – so, as far as people inside the house, your testimony is, one, you heard somebody say, "Who's out there?" initially, before you had said anything. When they say that is then when – your testimony is you say, "State Police," and then – you said that a few times, and then at some point Officer Mariscal says, "Come out, or we're coming in," and then you make a similar statement, "Come out, or we're coming in." And then somebody in response to those statements says, "Don't come in. We have guns." Is that right?
A: Yes.

*Id.* at 256.

It appears from Officer White's deposition testimony that he was standing next to Officer Mariscal and heard all of this when it occurred, showing that he was present at the scene when Officer Truesdale threatened to illegally enter the Pauly brothers' house if they did not come outside:

Q: So you approach, and based on Exhibit 10, the place where you have kind of the last part of the line is even with Officer Mariscal. All right. Was that intentional, that you kind of stopped beside him?
A: Was it intentional that night that I stopped next to him?
Q: Right.
A: I guess it – I think it would – it just happened.
Q: All right. And I don't mean that in any way, other than, it would sort of make sense, if you're approaching to a residence and you see another

22

officer there, that you're going to kind of go next to him.
A: Yeah.
Q: How far apart were you and Officer Mariscal at that point in time?
A: I don't know the exact distance. This is just where I felt that he was next to me. I didn't necessarily make any eye-to-eye contact with him or anything.
Q: Did you see him, though?
A: I saw that he was – I saw his initial location, and then I proceeded to – to go next to where I believed him to be.

                         \* \* \*

Q: Could you see inside the residence?
A: I could.
Q: What could you see?
A: *I could see what appeared to me as the living room, and I saw what appeared to be at least two different males walking within the living room window.*

*Id.* at 219 (emphasis added). This testimony shows that Officer White was standing next to Officer Mariscal and watched the two brothers "walking" inside the house. Although we do not know the exact time this occurred, we know that it was before the COBAN recording picked up Officer Mariscal saying that one of the brothers was "running" inside the house.

As noted above in Officer Truesdale's deposition testimony, only after Officer Mariscal stated that one of the brothers was running did a brother yell out, "We have guns." *Id.* at 256. The next audio picked up by the COBAN recording was the first gun shot, which occurred more than one minute later. "At 11:19:42 first shot is heard, 11:19:43 second shot, 11:19:47 third shot, dispatch is then heard repeating an officer's call out of shots fired. 11:19:52 fourth shot is heard. No other shots are heard." *Id.* at 164.

23

Thus, contrary to our determination in *Pauly I*, 814 F.3d at 1076, we are now persuaded a reasonable jury could find that Officer White participated in the events leading up to the armed confrontation and heard the other officers threaten the brothers by saying, "Come out or we're coming in." Aplt. App. at 678. A reasonable jury could thus conclude that Officer White acted recklessly by precipitating the need to use deadly force.

## IV

## Discussion

We address the officers' appeal from the district court's denial of their motions for summary judgment in light of the Supreme Court's decision in this case and in light of a reasonable probability that Officer White took part in the events that led to his use of deadly force. The officers each contend there are no genuine issues of material fact that would defeat their claim for qualified immunity.

Title "42 U.S.C. § 1983 allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law." *Cillo v. City of Greenwood Village*, 739 F.3d 451, 459 (10th Cir. 2013). "Individual defendants named in a § 1983 action may raise a defense of qualified immunity," *id.* at 460, which "protects 'government officials performing discretionary functions' and shields them from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1199 (10th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a

24

defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "If the plaintiff[s] satisfy[] this two-part test, 'the defendant bears the usual burden of a party moving for summary judgment to show that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Trask*, 446 F.3d at 1043 (quoting *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004)).

"Although we frequently conduct separate qualified immunity analyses for different defendants, we have not always done so at the summary judgment stage of excessive force cases." *Estate of Booker v. Gomez*, 745 F.3d 405, 421 (10th Cir. 2014). Indeed, when appropriate we will consider the officers' conduct in the aggregate. *See, e.g.*, *Lundstrom v. Romero*, 616 F.3d 1108, 1126-27 (10th Cir. 2010); *Fisher v. City of Las Cruces*, 584 F.3d 888, 895-902 (10th Cir. 2009); *York v. City of Las Cruces*, 523 F.3d 1205, 1210-11 (10th Cir. 2008); *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008); *Allen*, 119 F.3d at 840-41. But, we have also analyzed the conduct of each officer individually in excessive force cases at the summary judgment stage. *See, e.g., Casey*, 509 F.3d at 1282-87; *Walker v. City of Orem*, 451 F.3d 1139, 1159-61 (10th Cir. 2006); *Currier v. Doran*, 242 F.3d 905, 919-25 (10th Cir. 2001). As we explained above, in *Pauly I* we analyzed Officers Mariscal and Truesdale together while analyzing Officer White separately because we thought the facts warranted it. 814 F.3d at 1071. Although we now recognize that a reasonable jury could find Officer White's pre-seizure conduct

25

to be just as reckless as Officers Mariscal and Truesdale, we still believe the facts warrant a separate qualified immunity analysis because Officer White is the only officer who actually shot Samuel Pauly.

## A. Officer White

### 1. The Reasonableness of Officer White's Conduct

"[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395. We review these excessive force claims under a standard of objective reasonableness, "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* at 396. "In determining the reasonableness of the manner in which a seizure is effected, '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Scott*, 550 U.S. at 383 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). This balancing test "requires careful attention to the facts and circumstances of each particular case, including *the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.*" *Graham*, 490 U.S. at 396 (emphasis added). And our balancing must always account "for the fact that police officers are often forced to make split-second judgments—in

26

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. Ultimately, "the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Estate of Larsen*, 511 F.3d at 1260.

Turning to this case, we look first to Officer White, as he is the one who actually "seized" Samuel Pauly by shooting him. Viewing the facts in the light most favorable to plaintiffs, the district court determined that the brothers were in their home when Officers Mariscal and Truesdale—and Officer White shortly thereafter—approached their house while it was dark and raining and, without knocking on the door, made threatening comments about intruding into the home. In response, the brothers shouted "We have guns," hoping to scare off their perceived home invaders, and all three officers took cover. In particular, Officer White took cover behind a rock wall approximately fifty feet away from the house. Samuel Pauly opened the window of his home and pointed his gun aimlessly into the dark in the direction of Officer White. Within five seconds of Samuel pointing his gun out of the window, Officer White shot Samuel in the heart without first identifying himself or warning Samuel to put down his weapon. To analyze the reasonableness of Officer White's actions, we turn to the ubiquitous three factor test from *Graham v. Connor*.

**a. The First *Graham* Factor**

27

The first *Graham* factor, "the severity of the crime at issue," 490 U.S. at 396, weighs in favor of plaintiffs. The district court noted that once police arrived at the Glorieta off-ramp in response to a call concerning road rage, "the Officers did not believe any exigent circumstances existed," and they "did not have enough evidence or probable cause to make an arrest." Aplt. App. at 677. It is unclear from the record what, if any, crime was committed during the road rage incident. At best, the incident might be viewed as a minor crime such as reckless driving or driving while intoxicated.[5]

### b. The Second *Graham* Factor

The second *Graham* factor, "whether the suspect pose[ed] an immediate threat to the safety of the officers or others," 490 U.S. at 396, is undoubtedly the "most important" and fact intensive factor in determining the objective reasonableness of an officer's use of force, *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). Thus, like many of our excessive force cases, our analysis will focus mostly on it. *See, e.g., Estate of Larsen, 511 F.3d* at 1260-61; *Jiron v. City of Lakewood,* 392 F.3d 410, 418 (10th Cir. 2004); *Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989).

### i. The *Estate of Larsen* Test

In this case, Officer White used deadly force, and the use of deadly force is only justified if the officer had "probable cause to believe that there was a *threat of*

_____

[5] Under New Mexico law, reckless driving and driving while intoxicated (first offense) are misdemeanor offenses. *State v. Trevizo*, 257 P.3d 978, 982 (N.M. Ct. App. 2011) (citing N.M. Stat. Ann. § 66-8-113(B) (1978) (reckless driving); § 66-8-102(E) (DWI) (holding that one-year statute of limitations for petty misdemeanors applied to the defendant's DWI and reckless driving charges).

28

*serious physical harm to [himself] or others*," *Estate of Larsen*, 511 F.3d at 1260

(quoting *Jiron,* 392 F.3d at 415). Accordingly, in evaluating the degree of threat

facing an officer, we look to a four component test first highlighted in *Estate of*

*Larsen*:

> (1) whether the officers ordered the suspect to drop his weapon, and
> the suspect's compliance with police commands; (2) whether any
> hostile motions were made with the weapon towards the officers; (3)
> the distance separating the officers and the suspect; and (4) the
> manifest intentions of the suspect.

*Id*. We apply each in turn.

### 1) The First *Larsen* Component

The first *Larsen* component, "whether the officers ordered the suspect to drop his

weapon, and the suspect's compliance with police commands," *id.*, clearly supports

plaintiffs. Officer White did not identify himself or order Samuel Pauly to drop his

weapon. In excessive force cases, "if the suspect threatens the officer with a weapon . . .

deadly force may be used if necessary to prevent escape, and *if, where feasible*, some

warning has been given." *Garner*, 471 U.S. at 11-12 (emphasis added); *see also*

*Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003) (fact issue as to whether warning was

feasible before deadly shot fired). Plaintiffs' expert witness, Glenn A. Walp, testified

that in his professional opinion it was feasible for Officer White to give the suspect a

warning during the five-second interval between when Samuel aimed the gun and Officer

White fired his weapon, and that Officer White's failure to do so was unreasonable. *See*

Aplt. App. at 286. ("[B]etween the time when he saw the pointing of the weapon and

what we will use for the sake of argument here today, five seconds, I feel that there was

29

an extensive amount of time to at least yell something to the effect . . . of 'State Police, drop your weapon.'").[6]

## 2) The Second *Larsen* Component

The second *Larsen* component, "whether any hostile motions were made with the weapon towards the officers," 511 F.3d at 1260, weighs in favor of Officer White because the record reflects that Samuel Pauly pointed a handgun at Officer White, or at least in his direction. Officer White relies on some of our decisions for the proposition that use of deadly force is always reasonable where someone aims a gun at an officer. Aplt. Br. at 14 (citing *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1317-18 (10th Cir. 2009); *Wilson v. Meeks*, 52 F.3d 1547, 1553-54 (10th Cir. 1995), *abrogated on other grounds by Saucier*, 533 U.S. at 205). But the facts in those cases were entirely different from the facts here. In both cases, the officers were in close proximity to the suspect, and in *Wilson* one of the officers ordered the suspect to show his hands before he shot him. 52 F.3d at 1549. Neither of these facts is present in this case—Officer White was some fifty feet away and he did not order Samuel Pauly to show his hands before shooting him. Moreover, none of our cases have created a per se rule of objective reasonableness where a person points a gun at a police officer. *See Allen*, 119 F.3d 837 (denying qualified immunity to police officers who shot *armed man* because fact issues remained as to whether the officers' actions unreasonably precipitated the need to use deadly force); *see also Sledd v. Lindsay*, 102 F.3d 282, 288 (7th Cir. 1996) (denying qualified immunity to

---

[6] In *Tenorio v. Pitzer*, 802 F.3d 1160, 1163 (10th Cir. 2015), for instance, within "*two or three seconds*" the officer "yelled, 'Sir, put the knife down! Put the knife down, please! Put the knife down!'" before he shot the decedent.

police officers who shot *armed man* because there were fact questions as to whether officers announced their presence and whether a reasonable officer would have thought the plaintiff posed such a risk under all the circumstances that the immediate use of deadly force was justified); *Yates v. City of Cleveland*, 941 F.2d 444, 445, 449 (6th Cir. 1991) (denying qualified immunity to police officer who shot *armed man* because act of entering private residence late at night without identifying himself was enough to show he had unreasonably created the encounter that led to the use of force).

Moreover, and importantly, the district court determined that a genuine fact issue remains as to whether Samuel Pauly even fired his weapon. Although Officers White and Mariscal claim that Samuel fired the handgun, the district court noted the following:

> A revolver later found on the living room floor under the front window where Samuel Pauly was shot had one casing forward of the firing pin while the other four chambers were loaded. No bullet casing was recovered from the handgun, so there is no forensic proof that Samuel Pauly fired the handgun that night.

Aplt. App. at 681 n.8. Significantly, "Officer Mariscal strongly believes that he fired a shot at Samuel Pauly after Samuel Pauly fired the handgun," and the district court found that "Officer Mariscal was missing one cartridge from his magazine." *Id.* at 681 n.9 Thus, the court concluded the following: "since only four shots were fired that night, if Officer Mariscal fired the third shot as he claims and Officer White fired the fourth shot, then Samuel Pauly could not have fired upon Officer White." *Id.*

Officer White stated in his deposition that when he was kneeling behind the rock wall, he saw Samuel Pauly shoot a "silver gun" directly towards his face. Aplt. App. at 223-24 ("I observed the male, with his right hand, extend his hand in a parallel position to

the ground, pointing the gun toward my direction . . . [and] I observed the muzzle flash, and I heard the bang of the gun."). Nevertheless, "[b]ased on [the] physical evidence, a jury could reasonably decide to reject [Officer White's] testimony." *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) (holding fact issue precluded summary judgment on excessive force claim against officer). Indeed, "[c]onsidering the physical evidence together with the inconsistencies in the officer's testimony, a jury will have to make credibility judgments, and credibility determinations should not be made on summary judgment." *Id.* Moreover, "since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.'" *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). As the Ninth Circuit noted in *Scott*, 39 F.3d at 915, "the court may not simply accept what may be a self-serving account by the police officer." Rather, "[i]t must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* Thus, if the evidence is viewed in the light most favorable to Plaintiffs, Samuel Pauly did not fire his weapon at Officer White, but only pointed it in his direction while Officer White was fifty feet away and behind both physical cover and the cover of night.

### 3) The Third *Larsen* Component

The third *Larsen* component, "the distance separating the officers and the suspect," 511 F.3d at 1260, clearly supports plaintiffs because not only was Officer

32

White fifty feet away from Samuel Pauly, he was also sequestered behind a rock wall. And Samuel was aiming his gun through the open window of a lighted house toward a target obscured by the dark and rain.

As Officer White described it when he was asked to explain what he did after he heard "We have guns," he said he ran and took cover behind a rock wall *before* Samuel opened the window and stuck his gun out.

> Q. And, I'm sorry, I think you just said this, but the position that you took, you know, you ran down on the other side of the rock wall. Tell me again. Were you standing? Were you crouched? What position were you in?
> A. I was kneeling.
> Q. So you're kneeling, one knee up and one knee down?
> A. Both knees down.
> Q. So both of your knees were on the ground, and where–were you looking towards the residence?
> A. I was.
>
> * * *
>
> Q. So you kneeled down, both knees on the ground and looking over the top of the rock wall. Is that right?
> A. Correct.
> Q. Did you have your duty weapon drawn?
> A. I did.
>
> * * *
>
> Q. *Nobody was in the window at that point? Is that correct?*
> A. *That's correct.*
> Q. *Was the window up?*
> A. *As in closed? It was closed.*
> Q. Yes. So the window–both windows were closed at the point that you run down to the position in Exhibit 2?
> A. Correct.
> Q. *You have your weapon drawn. Where is it pointing at that time?*
> A. *It's pointing in the direction of the house.*
> Q. *Was it resting on the wall?*
> A. *It was.*

Aplt. App. at 222 (emphasis added). Officer White's own description of his position at the time Samuel Pauly opened the window and pointed his gun out clearly supports the

33

district court's description of him as "behind a stone wall located 50 feet from the front of the house." *Id.* at 680.

### 4) The Fourth *Larsen* Component

We consider the fourth *Larsen* component, "the manifest intentions of the suspect," 511 F.3d at 1260, to also weigh in favor of plaintiffs. All three officers claim that they announced their presence numerous times, but there is only one instance of audio evidence of their announcements, which comes from Officer Truesdale's COBAN recording, in which Officer Mariscal shouted "State Police" and "Open the Door." Aplt. App. at 164. Thus, we agree with the district court in its determination that "a reasonable jury could find" that "the Officers provided inadequate police identification by yelling out 'State Police' once," and "it would have been reasonable for the Officers to conclude that Daniel Pauly could believe that persons coming up to his house at 11:00 p.m. were connected to the road rage incident which had occurred a couple of hours previously." *Id.* at 685. Accordingly, if we view the evidence in the light most favorable to plaintiffs, the manifest intention of the brothers was to protect their home from ostensible home invaders.

In fact, under the version of events that plaintiffs present, it was no surprise that the brothers armed themselves to protect their home, because it was their constitutional right to do so:

> [T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. *The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.* Under any of

34

the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family . . . would fail constitutional muster.

*District of Colombia v. Heller*, 554 U.S. 570, 628-29 (2008) (emphasis added) (footnote, citation, and quotation marks omitted). Moreover, in *State v. Boyett*, 185 P.3d 355, 358 (N.M. 2008), the Supreme Court of New Mexico reiterated that the "[d]efense of habitation has long been recognized in New Mexico," and that "[i]t gives a person the right to use lethal force against an intruder when such force is necessary to prevent the commission of a felony in his or her home." Thus, viewing the facts in the light most favorable to plaintiffs, the manifest intention of the brothers was to protect their home after inadequate identification from the officers, which was their legal right under both the United States Constitution and New Mexico state law.

### ii. The Reckless Conduct of the Officers in Effecting the Seizure

Our precedent recognizes that "[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'"[7]

---

[7] This has been the law in our circuit since 1995. *See Sevier*, 60 F.3d at 699; *see also Allen*, 119 F.3d at 840. But the concept that pre-seizure conduct should be used in evaluating the reasonableness of an officer's actions is not universally held among other circuits. *See, e.g.*, *Schulz v. Long*, 44 F.3d 643 (8th Cir. 1995) (holding that evidence of pre-seizure conduct was irrelevant to reasonableness); *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (same); *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992) (same); *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991) (same). The Supreme Court very recently had an opportunity to resolve this issue but declined to do so:

*Jiron*, 392 F.3d at 415 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)).  We will "consider an officer's conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force."  *Allen*, 119 F.3d at 840 (quoting *Romero v. Bd. of Cty. Comm'rs*, 60 F.3d 702, 705 n.5 (10th Cir. 1995)); *cf. Garner*, 471 U.S. at 8 ("[I]t is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out.").  The officer's conduct prior to a suspect threatening force "is only actionable if it rises to the level of recklessness."  *Thomson*, 584 F.3d at 1320.  Thus, "[m]ere negligen[ce]" will not suffice.  *Sevier*, 60 F.3d at 699 n.7.

Our seminal case on this issue, *Allen v. City of Muskogee*, 119 F.3d 837 (10th Cir. 1997), is instructive.  In *Allen*, Mr. Allen left his home with ammunition and several guns after an altercation with his family.  *Id.* at 839.  The altercation was reported to the Wagoner County Sheriff's Department, which in turn sent a teletype message to the

---

> [Respondents] argue that the judgment below should be affirmed under *Graham* itself.  *Graham* commands that an officer's use of force be assessed for reasonableness under the "totality of the circumstances." 490 U.S., at 396, 109 S. Ct. 1865 (internal quotation marks omitted).  On respondents' view, that means taking into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it.  Brief for Respondents 42–43.  We did not grant certiorari on that question, and the decision below did not address it.  Accordingly, we decline to address it here.  See, *e.g., McLane Co. v. EEOC,* —— U.S. ——, ——, 137 S.Ct. 1159, 1170, 197 L.Ed.2d 500 (2017) ("[W]e are a court of review, not of first view" (internal quotation marks omitted)).

*County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 n.* (2017).  Thus, at least for now, *Sevier* and *Allen* remain good law in this circuit.

Muskogee Police Department ("MPD") describing Mr. Allen and his car, and warning that he was armed and had an outstanding decade-old warrant for impersonating an officer. *Id.* A 911 call from Mr. Allen's sister's house warned that Mr. Allen was threatening suicide. *Id.* When Lt. Smith arrived at the scene, he cleared bystanders from the area and found Mr. Allen sitting in the driver's seat of his vehicle. *Id.* Mr. Allen had one foot out the door and a gun in his right hand, which was resting on the center console. Seeing this, Lt. Smith told Mr. Allen to drop his gun several times. *Id.*

Officers McDonald and Farmer arrived at the scene shortly after Lt. Smith, and Officer McDonald joined Lt. Smith at the driver side door. *Id.* Lt. Smith reached into the vehicle, attempting to seize the gun, while Officer McDonald held Mr. Allen's left arm. *Id.* At this point, Officer Farmer attempted to open the passenger side door and Mr. Allen pointed the gun at him, forcing Officer Farmer to duck and move behind the car. *Id.* Mr. Allen then directed the gun towards Lt. Smith and Officer McDonald and shots were exchanged. *Id.* Lt. Smith and Officer McDonald fired a total of twelve shots—four of which struck Mr. Allen. *Id.* The entire encounter, from Lt. Smith's arrival to Mr. Allen's death, took ninety seconds. *Id.*

Mr. Allen's family brought a § 1983 claim against the officers involved and the City of Muskogee. The defendants moved for summary judgment and set forth a statement of facts in their brief, which the plaintiff did not dispute. *Id.* Ruling that there was no genuine issue of material fact and that defendants were entitled to judgment as a matter of law, the district court granted summary judgment in favor of defendants on plaintiff's § 1983 claim.

We reversed as to the individual officers. *Id.* at 845. We recognized that "[t]he excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force." *Id.* at 840 (citing *Sevier*, 60 F.3d at 699). We noted that "[w]e will thus consider an officer's conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force," *id.* (quoting *Romero*, 60 F.3d at 705 n.5), and pointed out that there was deposition testimony that Lt. Smith "ran 'screaming' up to Mr. Allen's car and immediately began shouting at Mr. Allen to get out of his car." *Id.* at 841. Since the altercation took place in a ninety-second window, we concluded that the officers' preceding actions were so "immediately connected" to Mr. Allen's threat of force that they should have been included in the reasonableness inquiry. Accordingly, we held that a reasonable jury could conclude that the officers' actions were reckless and precipitated the need to use deadly force. *Id.*

Similarly, in this case, the alleged reckless actions of all three officers were so immediately connected to the Pauly brothers arming themselves that such conduct should be included in the reasonableness inquiry. Thus, if we view the evidence in the light most favorable to plaintiffs, the threat made by the brothers, which would normally justify an officer's use of force, was precipitated by the officers' own actions and that Officer White's use of force was therefore unreasonable.

### iii. Whether Officer White Reasonably Feared for the Safety of the Other Officers

38

Finally, although Officer White claims he thought Officer Truesdale was hit by the two shotgun blasts he heard from behind the house, he admitted in his deposition that "I did not hear anything that would suggest [Officer Truesdale] had been hit." *Id.* at 223. Significantly, "the law is clear that [Officer White's] belief must be reasonable." *Attocknie v. Smith*, 798 F.3d 1252, 1257 (10th Cir. 2015). In our view, there is at least a fact question for the jury as to whether it was objectively reasonable for Officer White to immediately assume that one of his fellow officers was shot after hearing two shots from the back of the house but nothing more to indicate that anyone had been hit. *Cf. Attocknie*, 798 F.3d at 1257 (affirming denial of qualified immunity to officer and rejecting officer's claim he saw suspect run into house, noting "that a jury might reasonably refuse to credit his belief as reasonable" because a jury "could well find that [the officer] is not telling the truth about seeing someone running, or at least that he was not reasonable in inferring that the person he saw was [the suspect], especially given other evidence that [the suspect] was not seen by anyone else at the time and was not found there after the shooting.") Thus, there are multiple issues of fact that must be resolved in order to determine "whether [Samuel Pauly] pose[d] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. Accordingly, the second *Graham* factor does not weigh conclusively in favor of Officer White.

### c. The Third *Graham* Factor

The third *Graham* factor, "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, also weighs in favor of plaintiffs. As the district court determined, after the officers arrived at the Glorieta off-ramp, spoke

with the women about the incident, and then allowed the women to leave, "any threat to the females was over." Aplt. App. at 676. More importantly, the court recognized that "the Officers did not believe any exigent circumstances existed," and that at that point, they "*did not have enough evidence or probable cause to make an arrest*." *Id.* at 677 (emphasis added). Thus, when the officers, including White, went to the brothers' residence, they were not there to make an arrest because no grounds existed to do so. This is especially true for Samuel Pauly, who had been in his home playing video games before Daniel arrived that night. Accordingly, the brothers could not have been "attempting to evade arrest by flight," *Graham*, 490 U.S. at 396. This factor supports plaintiffs.

Based on the record in the present case, viewed in the light most favorable to plaintiffs, Officer White did not have probable cause to believe there was an *immediate* threat of serious harm to himself or to Officer Mariscal. This is especially true considering Officer White may have participated in the reckless conduct that lead to his perceived need to shoot Samuel Pauly. Thus, Officer White's use of deadly force was not objectively reasonable and violated Samuel Pauly's constitutional right to be free from excessive force.

## 2. Clearly Established

Having held that the evidence is sufficient to raise a fact issue regarding the excessive force claim, we turn to whether the law was clearly established at the time of the violation because "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Pauly II*, 137 S. Ct. at 551 (quoting *Mullenix*, 136 S. Ct. at

40

308).  "For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent."  *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))); *Hope*, 536 U.S. at 739 ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (internal quotation marks omitted)).  The Supreme Court has noted that "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741).  Indeed, "the dispositive question is 'whether the violative nature of *particular* conduct is clearly established,'" *id.* (quoting *al-Kidd*, 563 U.S. at 742) (emphasis added), and "[the] inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition,'" *id.* (quoting *Brosseau v.* 543 U.S. at 198).

The district court relied on *Allen*, 119 F.3d at 841, in concluding that Officer White had violated clearly established law.  It stated that "[s]ince 1997, it has been clearly established in the Tenth Circuit 'that an officer is responsible for his or her reckless conduct that precipitates the need to use force.'"  Aplt. App. at 687 (quoting *Murphy v. Bitsoih*, 320 F.Supp. 2d 1174, 1193 (D.N.M. 2004)).  But this statement

41

suffers from the same lack of specificity as does the general propositions from *Graham* and *Garner* that "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness," which, by itself, "is not enough." *Saucier*, 533 U.S. at 202; *see also Pauly II*, 137 S.Ct. at 552 ("The panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment."). The statement in *Allen*, that the reasonableness inquiry includes an evaluation of an officer's actions leading up to the use of force, is absolutely relevant in determining whether a police officer acted unreasonably in effecting a seizure, as we illustrated above. But it cannot alone serve as the basis for concluding that an officer's particular use of excessive force was "clearly established," *Pauly II*, 137 S. Ct. at 552. Accordingly, *Allen* is of little help in this case because the facts are completely different.

Because there is no case "close enough on point to make the unlawfulness of [Officer White's] actions apparent," *Pauly I*, 814 F.3d at 1091 (Moritz, J., Dissenting) (alteration in original) (quoting *Mascorro*, 656 F.3d at 1208), we conclude that Officer White is entitled to qualified immunity.

## B. Officers Mariscal and Truesdale

42 U.S.C. § 1983 not only imposes liability on those who actually deprive a person of their rights under the Constitution, but also imposes liability on those who "cause" a person to be subjected to a deprivation. "The requisite causal connection is satisfied if the defendant[s] set in motion a series of events that the defendant[s] knew or reasonably should have known would cause others to deprive the plaintiff of [his]

42

constitutional rights." *Trask*, 446 F.3d at 1046 (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)). This is plaintiffs' theory of liability for Officers Mariscal and Truesdale, that their reckless conduct leading up to the shooting caused Officer White to use constitutionally excessive force. But, as we explained above, Officer White is entitled to qualified immunity because his alleged use of excessive force was not clearly established in the circumstances of this case. It therefore cannot serve as the basis of liability for Officers Mariscal and Truesdale. *Cf. Mendez*, 137 S. Ct. at 1549 (stating that officers' violation of knock and announce rule, which appellate court held was a constitutional violation but not a clearly established one, could not serve as basis for liability on theory that it was proximate cause of subsequent use of force). And neither Officer Mariscal nor Truesdale committed a constitutional violation in his own right. Thus, there is no basis for holding either of them liable under § 1983.

Accordingly, we REVERSE the district court's denial of summary judgment to Officers Mariscal, Truesdale, and White, and REMAND with instructions to enter judgment in favor of each officer.

No. 14-2035, *Daniel T. Pauly, et al. v. Ray White, et al.*

**MORITZ**, J., concurring.

I agree with the majority that White is entitled to qualified immunity because the contours of the constitutional right at issue aren't clearly established.  *See* Maj. Op. 40–42. But unlike the majority, I would decline to address the constitutional question. *Compare id.* at 25–40, *with Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011) (stating that "courts should proceed directly to, 'should address only,' and should deny relief exclusively based on" plaintiff's failure to show that the law is clearly established where, e.g., "the . . . constitutional violation question 'is so factbound that the decision provides little guidance for future cases'" (first quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011); then quoting *Pearson v. Callahan*, 555 U.S. 223, 237 (2009))). Moreover, although I agree with the majority's ultimate conclusion that all three defendants are entitled to summary judgment, *see* Maj. Op. 43, I question whether the analytical approach the majority applies in reaching that conclusion is consistent with our case law.

My questions arise, in large part, from the procedural posture of this appeal. We typically lack jurisdiction to review the denial of a motion for summary judgment. *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015). But "denial of qualified immunity to a public official . . . is immediately appealable under the collateral order doctrine to the extent it involves abstract issues of law." *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013). "Specifically, we have jurisdiction 'to review "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, [and] (2) whether that law was clearly established at the time of the alleged

violation.”’”” *Cox*, 800 F.3d at 1242 (quoting *Roosevelt–Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013)).

Critically, in exercising that limited jurisdiction, we generally aren't at liberty to undertake our own de novo review of the record evidence. Instead, "[t]he district court's factual findings and reasonable assumptions comprise 'the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity.'" *Id.* (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008)); *see also Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) ("[I]f a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, . . . we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law.").

In short, "'whether or not the pretrial record sets forth a "genuine" issue of fact for trial' is *not* an abstract legal question that we may review" on interlocutory appeal. *Cox*, 800 F.3d at 1242 (quoting *Johnson v. Jones*, 515 U.S. 304, 320 (1995)); *see also Morris v. Noe*, 672 F.3d 1185, 1189 (10th Cir. 2012). Indeed, the question of whether a genuine issue of material fact exists is largely irrelevant to the qualified-immunity analysis. Instead, that question arises if—and only if—the plaintiff first demonstrates the defendant's alleged conduct violated clearly established law. *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) ("If, and only if, the plaintiff [shows a violation of clearly established law] does a defendant then bear the . . . burden of . . . showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995))).

2

Until a plaintiff makes that showing, "a federal court's factual analysis relative to the qualified-immunity question" asks only "whether [the] plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court." *Cox*, 800 F.3d at 1243 (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring)); *see also id.* ("[T]he objective" at that point "is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury." (alteration in original) (quoting *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring))).

The majority correctly articulates these standards. *See* Maj. Op. 2–3 (noting that we must accept as true those facts that district court found and relied on in denying summary judgment; acknowledging that we can't "consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove" (quoting *Morris*, 672 F.3d at 1189)); *id.* at 24 (stating that question of whether genuine dispute of material fact exists doesn't arise unless and until plaintiff first demonstrates that defendant violated clearly established constitutional right). But I'm not convinced that after articulating these standards, the majority applies them.

For instance, I question whether the facts the majority relies on in evaluating the constitutional question are part of the "the universe of facts" as the district court found it to exist, or whether instead the majority has gleaned at least some of those facts from its own independent review of the record. *Compare Cox*, 800 F.3d at 1242 (explaining that we must decide the constitutional question based on "[t]he district court's factual findings

3

and reasonable assumptions," as opposed to our own de novo review of the record), *with, e.g.*, Maj. Op. 18 ("Our review of the record on remand shows otherwise.").[1]

Likewise, I question whether the majority exceeds the bounds of this court's jurisdiction by taking a position on what facts a reasonable jury might find or whether any genuine disputes of material fact might exist. *Compare Cox*, 800 F.3d at 1242 ("'[W]hether or not the pretrial record sets forth a "genuine" issue of fact for trial' is *not* an abstract legal question that we may review [on interlocutory appeal]." (quoting *Jones*, 515 U.S. at 320)), *with* Maj. Op. at 23 ("[A] reasonable jury could find that . . . White participated in the events leading up to the armed confrontation and heard the other officers threaten the brothers by saying, 'Come out or we're coming in.'" (quoting Aplt. App. at 678)), *id.* at 38 ("In our view, there is at least a fact question for the jury as to whether it was objectively reasonable for . . . White to immediately assume that one of his fellow officers was shot after hearing two shots from the back of the house but nothing more to indicate that anyone had been hit."), and *id.* at 39 ("Thus, there are multiple issues of fact that must be resolved in order to determine 'whether [Samuel Pauly] pose[d] an immediate threat to the safety of the officers or others.'" (alterations in original) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989))).

---

[1] True, when a "district court fails to make its factual assumptions explicit, we must 'undertake a cumbersome review of the record' to ferret out facts that the district court 'likely assumed.'" *Fogarty*, 523 F.3d at 1154 (10th Cir. 2008) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)). But the majority doesn't suggest that's what happened here.

Finally, even assuming this court *may* take a position on whether such fact questions exist, I question whether it's appropriate to do so in determining, for purposes of the qualified immunity analysis, whether the plaintiffs have demonstrated a constitutional violation. *See, e.g.*, *id.* at 40 ("Having held that the evidence is sufficient to raise a fact issue regarding the excessive force claim, we turn to whether the law was clearly established at the time of the violation . . . .").

Before the burden shifts to a defendant to demonstrate that no genuine issues of material fact exist, a plaintiff must first show both (1) a violation of (2) clearly established law. *See Nelson*, 207 F.3d at 1206. And here, the majority concludes that the plaintiffs fail to clear the second of these two hurdles. That is, the plaintiffs fail to demonstrate that the law is clearly established. *See* Maj. Op. 40–42. Accordingly, the defendants are entitled to qualified immunity and the burden never shifts to them to show that no genuine issues of material fact exist. *See Nelson*, 207 F.3d at 1206; *Cox*, 800 F.3d at 1243 (explaining that the court's objective isn't to "determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury" (quoting *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring))); *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 940 n.6 (10th Cir. 2008) ("[T]he task of district courts, and consequently appellate courts, is different in reviewing motions for summary judgment under traditional standards and qualified immunity principles," and "courts should exercise care not to confuse the two analytic frameworks."). As a result, I see no need to resolve whether such fact questions exist.

Nevertheless, despite my reservations about the majority's analytical approach, I agree with its ultimate conclusion: even assuming that (1) all the facts the majority relies on belong to the "universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity," *Cox*, 800 F.3d at 1242 (quoting *Fogarty*, 523 F.3d at 1154), and (2) under those facts, White violated Samuel Pauly's constitutional right to be free from excessive force, no existing precedent "place[s] the . . . constitutional question beyond debate," Maj. Op. 40 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). Accordingly, White is entitled to qualified immunity. *Id.* at 42. And because White is entitled to qualified immunity, his conduct "cannot serve as the basis of liability for" Mariscal and Truesdale. *Id.* Thus, all three defendants are entitled to summary judgment and we must reverse and remand with directions to enter judgment in their favor. *Id.* at 43.